[No. A125254. First Dist., Div. Two. June 17, 2010.]

R. BRIAN HINES et al., Plaintiffs and Appellants, v.
CALIFORNIA COASTAL COMMISSION et al., Defendants and
Respondents, STEVEN M. STAR et al., Real Parties in Interest and
Respondents.

832

834

COUNSEL

Law Offices of Stephan C. Volker, Stephan Coles Volker and Shannon L. Chaney for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Christiana Tiedeman and Patricia Sheehan Peterson, Deputy Attorneys General, for Defendant and Respondent California Coastal Commission.

Steven M. Woodside, County Counsel, and Debbie F. Latham, Deputy County Counsel, for Defendant and Respondent Board of Supervisors of Sonoma County.

Perry, Johnson, Anderson, Miller & Moskowitz, Leslie Raymond Perry and Deborah S. Bull for Real Parties in Interest and Respondents.

## OPINION

## KLINE, P. J.—

## INTRODUCTION

R. Brian Hines and Jane Hines appeal from the San Francisco Superior Court's denial of their petition for writ of administrative mandate. (Code Civ. Proc., § 1094.5.) Appellants' writ petition sought to overturn the approval by the Sonoma County Board of Supervisors (Board) of a coastal permit to construct a residence and a use permit allowing reduction of the riparian corridor setback from 100 feet to 50 feet for the project. The writ petition also challenged the California Coastal Commission's (Coastal Commission or Commission) refusal to exercise jurisdiction over appellants' appeal on the grounds that the appeal presented "no substantial issue" under the California Coastal Act of 1976 (Coastal Act) (Pub. Resources Code, § 30000 et seq.).[1] The permits were issued to real parties in interest Steven M. Star and Carol Star, who propose to build a 1,208-square-foot single-family residence and 400-square-foot detached garage on their property, adjacent to property owned by appellants in a Bodega Bay subdivision located in the Sonoma County coastal zone.[2]

Appellants contend the project violates the 100-foot riparian setback requirement of the Sonoma County Local Coastal Program. Therefore, they argue, the Board's approval of the project and the Coastal Commission's refusal to exercise jurisdiction over their appeal violated the Coastal Act. They further maintain that the project was subject to the California Environmental Quality Act (CEQA) (§ 21000 et seq.), and that both the Board and the Coastal Commission violated CEQA by failing to investigate and consider mitigation measures and alternatives to the project. Finally, appellants contend that the Board and the Coastal Commission each abused its discretion in approving the project and denying appellants' appeals. We shall affirm the judgment.

---

[1] All statutory references are to the Public Resources Code, unless otherwise indicated.

[2] The Stars have filed a respondents' brief and respondent Board has joined in and adopted that brief.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 31, 2006, the Stars filed their application for a coastal permit and use permit for the construction of a 1,208-square-foot single-family home and a 400-square-foot garage on their 26,825-square-foot lot in the Sereno Del Mar subdivision, along the Sonoma coast. As described in the staff report of the county's board of zoning adjustments (BZA), the residence was proposed to be sited approximately 50 feet from the edge of riparian vegetation located on the adjacent "Natural Drainage Easement" parcel to the north. Riparian vegetation was present along the banks of the freshwater stream approximately 15 feet north of the lot. Although not specifically listed in the Sonoma County Local Coastal Program as a riparian habitat, county staff determined that the waterway met the definition of a riparian habitat, subject to the 100-foot development setback under local coastal plan policy section III-12, item 9 (LCP Policy 9). A dense thicket of coyote brush extends from the top of the bank approximately 50 feet wide, creating a buffer between the proposed building site and the riparian habitat. Coyote brush is not considered to be a riparian plant.

The proposed residential project included appurtenant utility connections and development of a two-bedroom septic system. The septic system would occupy a large portion of the front half of the project site, leaving a very limited area in which to construct the residence, given the required riparian, side yard and septic setback requirements. The Stars' application sought a use permit for a 50-foot setback from an offsite, identified watercourse, instead of the 100-foot setback of LCP Policy 9.[3]

In addition to providing notice by posting, the county noticed appellants and other owners of property within 300 feet of the subject property by mailing notice of the Stars' permit application and of the public hearing to be held before the BZA. The notice advised that the Sonoma County Permit and Resource Management Department had determined the project to be categorically exempt from CEQA, because CEQA guidelines provide a categorical exemption for new construction and conversion of small structures. (Cal. Code Regs., tit. 14, § 15303, subd. (a).)[4] The notice also advised that appeals of the BZA determination could be made to the Board and the Board's decision could be appealed to the Coastal Commission. The notice further advised that in a later court challenge to the project "you may be limited to raising only those issues previously raised before the [BZA] at the hearing or in written form delivered to the [BZA] prior to or at the hearing."

---

[3] When the Stars purchased the lot, it enjoyed approved permits for a three-bedroom septic system and a home. A reduction in the 100-foot riparian setback to 50 feet had been approved in 2004, but the approval expired in 2006.

[4] Further references to the California Code of Regulations are to title 14, which will be referred to as "Regulations."

On December 13, 2007, following a public hearing at which appellant R. Brian Hines spoke, the Sonoma County BZA approved with conditions both the coastal permit to construct the residence and garage and the use permit. One of the conditions required that the Stars redesign the project to maximize the setback area, but allowed the setback to be minimized to 50 feet, if necessary.[5]

*Appeal to the Board*

On December 24, 2007, appellants appealed the determination of the BZA to the Board. The appeal charged that the reduced riparian setback was inconsistent with the Sonoma County Local Coastal Plan.[6] Appellants noted that their own request for a reduced riparian setback on the same street had been denied by the BZA in 2006, and that they had been required to redesign their home.[7] Notice of the public hearing before the Board on the appellants' appeal of the BZA determination was again provided by publication, posting, and mailing to owners of property within 300 feet of the project and to other interested persons who had requested notice.

On March 11, 2008, following a public hearing at which appellant Hines again spoke, the Board approved the proposed project and reduced riparian setback with conditions. The Board found that a 50-foot riparian setback was adequate to protect the resource, and that the reduced riparian setback was consistent with the local coastal plan. The Board did not require that the project be redesigned to maximize the setback, but required that the 50-foot minimum riparian setback apply to all onsite development and that the setback area remain in a natural and undisturbed state.

The Board found the project consistent with the local coastal plan "in that [LCP Policy 9] of the plan states that development shall be allowed only if it can be sited and designed to prevent impacts which would significantly degrade riparian areas, and shall be compatible with the continuance of the

[5] One of the conditions of BZA approval was that the Stars consult with the county well and septic division experts to determine whether there was any possibility of moving the septic system so as to provide a greater riparian setback. The well and septic division reported that the septic plans were evaluated and it was determined the system could not be moved to any other location on the site.

[6] Appellants also challenged the residence's 19-foot height as inconsistent with the subdivision's covenants, conditions and restrictions, which generally limit development to a maximum 16-foot height. This approval is not challenged here and we do not discuss it.

[7] Appellants' adjoining lot had gone through a similar permitting process. Their application for a reduction of the same setback was denied. Appellants' application was for a 3,724-square-foot home, with a 690-square-foot garage. Appellants' lot is 5,425 square feet larger than the Stars' adjacent lot. Appellants then reapplied for a permit for a 3,164-square-foot home, which application was approved.

riparian habitat. Based on the biotic study prepared for this project and the analysis included in the . . . Staff Report, no riparian habitat will be impacted as a result of the setback reduction to no less than 50 feet from top of bank. . . ." (Board resolution finding No. 3.) The biotic study referred to was a "Riparian Corridor Determination" study prepared by Kjeldsen Biological Consulting, dated December 4, 2003 (Kjeldsen biotic study).

The Kjeldsen biotic study described its site inspection and contained a detailed list of all plant species found on the site or in the vicinity. The parcel was described as fallow grassland that is routinely mowed. Offsite there is a stream that has riparian vegetation along its banks. According to the Board, the study concluded that "due to the site conditions and habitat present, a 50-foot setback is adequate to protect the riparian resources, and will not significantly degrade the riparian habitat for the following reasons: [¶] a) The riparian corridor and riparian vegetation is confined to the incised channel of the drainage. [¶] b) The presence of a Coyote Brush cover on the upland bank between the riparian corridor and riparian vegetation will provide a buffer. This upland shrub vegetation will provide a continuous buffer along the northern property line." (Board resolution finding No. 2.)

The findings and conclusions of the Kjeldsen biotic study were verified by the Department of Fish and Game's district fishery biologist Bill Cox, who stated in a 2004 e-mail to the county: "As we discussed before, I have no objection to reducing the creek setback on the . . . property . . . from 100 feet to 50 feet. From the Kjeldsen report it is clear that all stream and riparian resources would be preserved with a 50-foot setback. The only loss of habitat would [sic] coyote brush and would not be significant. This stream is ephemeral in nature and supports no fish or other aquatic population."

The Board found that the proposed project met "all of the required standards contained within Attachment 'M' of the Local Coastal Plan Administrative Manual which allows a reduction in the setback to no less than 50 feet for the following reasons: a protective buffer will be located between the proposed project and the riparian habitat; the buffer will consist of an existing cover of Coyote Brush which is not considered riparian vegetation; and the buffer provides protection to the habitat from adverse impacts caused by the development." (Board resolution finding No. 4.) The permit was conditioned to require the setback to remain in its natural and undisturbed state and the use of herbicide and pesticide applications was prohibited outside of structures.

The Board also found the only suitable location for the septic system was on the front portion of the parcel, dictating placement of the dwelling at the rear of the lot. (Board resolution finding No. 5.) The Board further found

there were significant constraints on development of the residence on the lot (Board resolution finding No. 6), and that "[g]iven the significant development constraints imposed on the subject site lot by riparian, side yard and septic setback requirements, strict compliance with the 100-foot riparian setback would deny the owners the reasonable use of their property and result in a taking" (Board resolution finding No. 7).

Finally, the Board also found the project was categorically exempt from CEQA under section 15303, subdivision (a) of the Regulations. (Board resolution finding No. 8.)

Appellants timely appealed the Board's action to the Coastal Commission. Appellants submitted in writing their reasons for the appeal. Also included in the record before the Coastal Commission was correspondence to the county and to the Coastal Commission that had been submitted by residents of the subdivision and others in opposition to the granting of the permit.

On May 9, 2008, following a public hearing at which appellant Hines spoke, the Coastal Commission followed the recommendation of its staff and unanimously determined that the appeal did not give rise to a "substantial issue." (§ 30625, subd. (b).) Therefore, the appeal was dismissed.

Appellants filed a petition for writ of administrative mandamus on June 9, 2008. Following briefing and a hearing on March 26, 2009, the court denied the writ petition. Judgment was entered on May 22, 2009, and this timely appeal followed.

## STANDARD OF REVIEW

In *McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912 [87 Cal.Rptr.3d 365] (*McAllister*), the Court of Appeal reiterated the appropriate standard of review in cases like this: "In reviewing an agency's decision under Code of Civil Procedure section 1094.5, the trial court determines whether (1) the agency proceeded without, or in excess of, jurisdiction; (2) there was a fair hearing; and (3) the agency abused its discretion. [Citation.] An ' "[a]buse of discretion is established if the [agency failed to proceed] in the manner required by law, [its] order or decision is not supported by the findings, or the findings are not supported by substantial evidence." ' ([Citations]; § 30801; Code Civ. Proc., § 1094.5, subd. (b).)

"The trial court presumes that the agency's decision is supported by substantial evidence, and the petitioner bears the burden of demonstrating the contrary. [Citations.] In reviewing the agency's decision, the trial court examines the whole record and considers all relevant evidence, including

evidence that detracts from the decision. [Citation.] 'Although this task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission. Rather, it is for the [agency] to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it.' [Citations.] On the other hand, the trial court exercises independent judgment on pure questions of law, including the interpretation of statutes and judicial precedent. [Citations.]" (*McAllister, supra*, 169 Cal.App.4th at pp. 921–922.)

"On appeal from the denial of a petition, our role is identical to that of the trial court. [Citations.]" (*McAllister, supra*, 169 Cal.App.4th at p. 922; accord, *Alberstone v. California Coastal Com.* (2008) 169 Cal.App.4th 859, 863 [86 Cal.Rptr.3d 883] (*Alberstone*).)

## COASTAL ACT AND LOCAL COASTAL PROGRAM POLICIES

A. *The Coastal Act*

In *McAllister, supra*, 169 Cal.App.4th 912, the Sixth Appellate District described the Coastal Act (§ 30000 et seq.), its policies and component parts:

■ "The California Coastal Act . . . (§ 30000 et seq.) provides 'a comprehensive scheme to govern land use planning for the entire coastal zone of California.' [Citation.] One of its goals is to '[p]rotect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and artificial resources.' (§ 30001.5, subd. (a).) To achieve this goal, the Act sets forth specific policies governing public access, recreation, the marine environment, land resources, and development along the coast. (§§ 30210–30265.5.)

" 'The Coastal Act creates a shared responsibility between local governments and the Coastal Commission for the planning of coastal development. Local governments are required to Develop Local Coastal Programs (LCPs) that consist of policies and plans for coastal development within the coastal areas of their jurisdiction.' (4 Manaster & Selmi, Cal. Environmental Law and Land Use Practice (2008) Coastal Zone Regulation, § 66.20, p. 66-29, fn. omitted . . . ; see *Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1344 [44 Cal.Rptr.3d 867].)

■ "A local coastal program includes a land use plan, which functions as the general plan for property in the coastal zone; and a local implementation

plan, which includes the zoning, zoning maps, and other implementing actions for the coastal zone. (§§ 30108.5, 30108.6.) After a local government prepares its local coastal program, the Commission reviews it. If satisfied that it conforms to the policies and standards of the Act, the Commission certifies it. (§§ 30512, subd. (c), 30513; [citations].)" (*McAllister, supra*, 169 Cal.App.4th at pp. 922–923.) Where provisions of the Coastal Act and CEQA are inconsistent, Coastal Act provisions govern. (§ 21174; *Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 859 [28 Cal.Rptr.3d 316, 111 P.3d 294].)

"The Coastal Act reflects ' " 'a strong rule of policy, adopted for the benefit of the public' " that implicate[s] matters of vital interest.' [Citation.] The Act provides heightened protection for areas that are designated 'environmentally sensitive habitat areas' . . . and establishes strict preferences and priorities that guide development in them.[8] (§ 30240; [citation].) Specifically, section 30240 provides: '(a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas. [¶] (b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas.' " (*McAllister, supra*, 169 Cal.App.4th at p. 923 & fn. 6.)

B. *The Sonoma County Local Coastal Program*

The Local Coastal Program of Sonoma County is made up of three components: the "Local Coastal Plan," the "Administrative Manual," and the "Coastal Zoning Ordinance." The Coastal Commission certified Sonoma County's Local Coastal Program on December 12, 2001.

Section III-4 of the Local Coastal Plan sets forth the "hierarchy of environmental sensitivity" established following an environmental assessment. "Especially sensitive areas are designated Sanctuary-Preservation; the more important environmental resource areas are designated Conservation; the remaining environmental resources are designated Potentially Sensitive."

In accordance with section 30240, the Local Coastal Plan continues:

"Sanctuary-Preservation areas are the most environmentally sensitive areas along the coast. They correspond to 'Environmentally Sensitive Habitat

---

[8] "Section 30107.5 defines 'environmentally sensitive area' to mean 'any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments.' "

Areas' as defined in the 1976 Coastal Act Sections 30107.5 and 30240. No development other than nature trails and resource dependent uses shall be allowed within such areas. There shall be no significant disruption of habitat values. Pesticide and herbicide applications would not be allowed within or affecting such areas unless it is necessary to maintain or enhance the functional capacity of the Sanctuary Preservation area.

"Conservation areas also encompass sensitive resource areas. No development will be allowed in Conservation areas unless an environmental study determines that no adverse effects would occur. Pesticide and herbicide applications would not be allowed within or affecting Conservation areas unless it is necessary to maintain or enhance the functional capacity of the Conservation area.

"Potentially sensitive areas include minor or disturbed drainages, coastal bluffs, beaches, windbreaks, known or suspected archaeological sites, and sensitive soils. [¶] Of the mapped environmental resources, the potentially sensitive are the least sensitive or are of undetermined sensitivity. Development shall be allowed only if no adverse effects would occur. Environmental studies may be required." (Local Coastal Plan, § III-4.)

The Sonoma County Local Coastal Plan, section III-3, defines a "riparian" habitat as: "Tree and shrub vegetation of freshwater courses. A line or belt of vegetation following the course of a river or stream on the immediate banks and appearing visually and structurally separate from the surrounding landscape. Boundaries are delineated by the outer edge of riparian vegetation. Riparian vegetation consists of that vegetation in or adjacent to permanent or intermittent freshwater streams and other freshwater bodies where at least 50 percent of the cover is made up of species such as alders, willows, cottonwoods, box elders, ferns, and blackberries." (Local Coastal Plan, § III-3.)

LCP Policy 9 is located in the Local Coastal Plan, section III-12, "ENVIRONMENTAL RESOURCES MANAGEMENT RECOMMENDATIONS." The introduction to section III-12 states: "The habitats or specific resources which have been mapped for the Sonoma County coast are listed below with management recommendations for each." There follows a list of the various habitats and resources, including "Riparian" resources,[9] under which LCP Policy 9 is placed.

---

[9] A note preceding LCP Policy 9 provides: "Note—Where General Plan standards and policies are more restrictive than the following, development shall comply with the General Plan or Coastal Plan policies, whichever are more restrictive, provided that no development shall be approved which does not comply with Coastal Plan policies." (Local Coastal Plan, § III-12.)

LCP Policy 9, upon which appellants base their challenge to the actions of the Board and the Coastal Commission, provides in its entirety: *"Prohibit construction of permanent structures within riparian areas as defined, or 100 feet from the lowest line of riparian vegetation, whichever is greater*, except development dependent on the resources in the riparian habitat, including public recreation facilities related to the resource. Any development shall be allowed only if it can be sited and designed to prevent impacts which would significantly degrade such areas, and shall be compatible with the continuance of the riparian habitat. The riparian area or 100 foot wide buffer zone should generally be maintained in a natural, undisturbed state. Trails and access may be permitted if studies determine no long-term adverse impacts would result from their construction, maintenance, and public use. Trails should be made of porous materials." (Local Coastal Plan, § III-12, italics added.)

Attachment "M" of the certified Administrative Manual (the second component of the Sonoma County Local Coastal Program) was developed to further interpret and implement the riparian policies of the Local Coastal Plan, by setting criteria for establishing buffer widths. Seven criteria or "standards" for establishing buffer areas are described in attachment "M." They are titled: "1. Biological significance of adjacent lands"; "2. Sensitivity of species to disturbance"; "3. Susceptibility of parcel to erosion"; "4. Use of natural topographic features to located development"; "5. Use of existing cultural features to locate buffer zones"; "6. Lot configuration and location of existing development"; and "7. Type and scale of development proposed." (Admin. Manual, attachment "M.")

Notably, the preamble to the seven buffer area standards of attachment "M" states: "A buffer area provides essential open space between the development and the environmentally sensitive habitat area. The existence of this open space ensures that the type and scale of development proposed will not significantly degrade the habitat area (as required by Section 30240). Therefore, development allowed in a buffer area is limited to access paths, fences necessary to protect the habitat area, and similar uses which have either beneficial effects or at least no significant adverse effects on the environmentally sensitive habitat area. *A buffer area is not itself a part of the environmentally sensitive habitat area, but a 'buffer' or 'screen' that protects the habitat area from adverse environmental impacts caused by the development.* [¶] A buffer area should be established for each development adjacent to environmentally sensitive habitat areas based on the standards enumerated below. *The width of a buffer area will vary depending upon the analysis. The buffer area should be a minimum of 100 feet for small projects on existing lots (such as one single family home or one commercial office building) unless the applicant can demonstrate that 100 feet is unnecessary to protect*

*the resources of the habitat area*. . . ." (Admin. Manual, attachment "M," italics & underscoring added.)

## THE BOARD'S APPROVAL OF A REDUCED BUFFER

Appellants contend that the Board abused its discretion in approving the reduction of the 100-foot buffer required by LCP Policy 9. They maintain that LCP Policy 9 absolutely forbids construction of permanent structures within 100 feet from the lowest line of riparian vegetation, "except development dependent on the resources in the riparian habitat, including public recreation facilities related to the resource." (LCP Policy 9.)

The Board determined that LCP Policy 9, as interpreted and implemented by attachment "M," allowed the project to be sited within the default 100-foot buffer where "the applicant can demonstrate that 100 feet is unnecessary to protect the resources of the habitat area." (Admin. Manual, attachment "M.")

Appellants concede that the riparian buffer zone at issue here is *not* an environmentally sensitive habitat area, stating, "The riparian zone at issue here is entitled to protection not because it is an Environmentally Sensitive Habitat Area (which it is not) but because it is a riparian habitat identified as such by both the County and the Commission." Appellants further argue that attachment "M" applies *only* to buffers adjacent to environmentally sensitive habitat areas.

We agree the riparian area involved is not an environmentally sensitive habitat area (nor is it a "Sanctuary-Preservation" area under the Local Coastal Plan) and that approval of the project does not violate section 30240. Although it was acknowledged to be "riparian habitat" in the Kjeldsen biotic study and by the county, Sonoma County's Local Coastal Program did not identify the riparian area at issue as a "Sanctuary-Preservation area"—the Local Coastal Plan equivalent of an "environmentally sensitive habitat area." The watercourse is not even mapped under the Local Coastal Program and not all coastal habitats and resources are treated therein as "environmentally sensitive habitat." The category of Sanctuary-Preservation areas is designed to comply with the mandate of section 30240, preventing development, except that dependent on those resources. For conservation areas, an environmental study determining the project can be accomplished with no adverse effects is required before development. For potentially sensitive areas—the most likely category for this riparian resource—development is allowed, if no adverse effects occur. However, the Board may require an environmental study. There is no prohibition of non-resource-based development in either conservation areas or potentially sensitive areas. The Local Coastal Plan does not require that all riparian habitat be treated as Sanctuary-Preservation areas without regard to their character or resource value.

Nor would this riparian habitat meet the definition of "environmentally sensitive habitat" as incorporated into the Local Coastal Plan as Sanctuary-Preservation areas. "Section 30107.5 defines 'environmentally sensitive area' to mean 'any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments.' " (*McAllister, supra,* 169 Cal.App.4th at p. 923, fn. 6.) There is no suggestion in the record that this riparian corridor meets this definition. The conclusion that this stream is not appropriate for categorization as a Sanctuary-Preservation area is supported by the Kjeldsen biotic study that showed no rare or especially valuable plant life, and the Department of Fish and Game report that the "stream is ephemeral in nature and supports no fish or other aquatic population."[10]

Still, appellants contend that LCP Policy 9 and *McAllister, supra,* 169 Cal.App.4th 912, absolutely prohibit the development of this single-family home and garage within 100 feet of the riparian area. We disagree. LCP Policy 9 is neither equivalent to nor the embodiment of section 30240 of the Coastal Act, although much of the language of the policy parallels that of section 30240. As we have observed, LCP Policy 9 is included in a list of "Environmental Resources Management *Recommendations*" and the preamble to the section acknowledges again they are "management *recommendations* for each" of the listed habitats or specific mapped resources. (Local Coastal Plan, § III-12, italics added.) The recommendation for riparian habitats is that non-resource-dependent construction of permanent structures be prohibited within 100 feet from the lowest line of the riparian vegetation. As interpreted and implemented by attachment "M" to the Administrative Manual, which is a key component of the Local Coastal Program, the buffer area "provides essential open space between the development and the environmentally sensitive area." Again, even assuming the riparian resource at issue here were an "environmentally sensitive habitat," attachment "M" sets forth seven standards for establishing the buffer area. Although it recommends that the "buffer area *should be* a minimum of 100 feet for small projects on existing

---

[10] Were we to construe the local coastal plan as including all riparian habitat as Sanctuary-Preservation area—which we do not—even so, the project does not involve development intruding *into* the habitat, but rather into the buffer area. Hence, section 30240, which strictly limits development of environmentally sensitive habitat to that dependent on the resource, and even then to development that does not degrade the habitat, would not absolutely prohibit development. Rather, it requires that "[d]evelopment in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas." (§ 30240, subd. (b).) The record provides substantial evidence that the single-family residence at issue would not significantly degrade the riparian habitat and that it would be "compatible with the continuance of those habitat . . . areas." (*Ibid.*)

lots (such as one single family home . . .)," it expressly allows development within the 100-foot buffer area where "the applicant can demonstrate that 100 feet is unnecessary to protect the resources of the habitat area." (Admin. Manual, attachment "M," italics added.) The Board determined that appellants had shown that a 50-foot buffer was appropriate under the standards set forth in attachment "M." Substantial evidence supports that finding,[11] and appellants do not appear to dispute on this appeal that application of the seven standards supported a decreased buffer area.[12]

Appellants claim the attachment "M" exception to the 100-foot buffer minimum does not apply here, because attachment "M" applies *only* to buffer areas between development and "environmentally sensitive habitat areas," and the riparian area here is not an "environmentally sensitive habitat area." Logically, it makes no sense to allow an exception based on specific criteria for a *more* sensitive habitat, but disallow such an exception for a less sensitive habitat. We cannot see how the Board abused its discretion in using the seven standards set forth in attachment "M" to determine the appropriate width of the buffer zone in this case.

■ Appellants next argue that attachment "M" applies only to the process of *establishing* buffer areas and not to the determination of exceptions from the established buffers. Appellants raise this claim for the first time on appeal. The argument was not made before the county administrative bodies considering the permits. Nor was it made before the Coastal Commission. In the trial court, appellants argued that attachment "M" was being misapplied and that it applied to the establishment of "environmentally sensitive habitat areas," but did not contend that it was only applicable when the buffer was initially established. "It is a firmly entrenched principle of appellate practice that litigants must adhere to the theory on which a case was tried. Stated

---

[11] As the Coastal Commission staff report states: "In this case, the County found that the applicant has demonstrated that 100 feet is unnecessary to protect the resources of the riparian area, and therefore Sonoma County has a high degree of factual and legal support for its decision. Seven standards are enumerated in Attachment 'M' for determining appropriate buffer widths (and hence reducing buffer widths from the required 100 feet). Consistent with the requirements of the [Local Coastal Program], Sonoma County evaluated each of these standards in making its decision to approve the reduced buffer width at the subject site." The Coastal Commission staff also analyzed the project under the standards, using the Sonoma County staff report, the Kjeldsen biotic study, aerial photographs, and the Sonoma County Local Coastal Program.

[12] In the trial court, appellants argued that standard 6 of attachment "M," "Lot configuration and location of existing development," supported a minimum 100-foot buffer as the subdivision was largely built out and that only three out of 20 houses built along the stream are less than 100 feet from the stream. They do not repeat that claim here, perhaps because the staff report before the Coastal Commission based on an aerial photograph of the subdivision determined there was no consistent or uniform setback from the riparian area. This interpretation was not clearly erroneous.

otherwise, a litigant may not change his or her position on appeal and assert a new theory. To permit this change in strategy would be unfair to the trial court and the opposing litigant." (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 [88 Cal.Rptr.2d 758]; accord, e.g., *City of Merced v. American Motorists Ins. Co.* (2005) 126 Cal.App.4th 1316, 1327 [24 Cal.Rptr.3d 788].) Although we may consider a new theory "when it is purely a matter of applying the law to undisputed facts" (*Brown v. Boren*, at p. 1316), we decline to do so. Appellants have waived this new theory.

Were we to consider this claim, we would find it without merit. Although entitled "Criteria for Establishing Buffer Areas," attachment "M," by its own terms, demonstrates that it is designed to be applied not only to the initial establishment of a buffer, but to each project under consideration as well. Attachment "M" expressly provides that "[a] buffer area should be established for *each* development adjacent to environmentally sensitive habitat areas . . . ." (Admin. Manual, attachment "M," italics added.) Standard 1 of attachment "M" begins with the recognition that "[l]ands adjacent to a wetland, stream, or riparian habitat area vary in the degree to which they are functionally related to these habitat areas." Standard 7 also speaks to individual developments, providing that "[t]he type and scale of the proposed development will, to a large degree, determine the size of the buffer area necessary to protect the environmentally sensitive habitat area. . . . However, such evaluations should be made on a *case-by-case basis* depending on the resources involved, and the type and density of development on adjacent lands." (Italics added.) Moreover, appellants' argument that the buffer for a channelized stream is fixed at a minimum of 100 feet by LCP Policy 9 renders meaningless the exception language of attachment "M" for "small projects on existing lots" where "the applicant can [and does] demonstrate that 100 feet is unnecessary to protect the resources of the habitat area," as the Stars did here.

Appellants cite *McAllister, supra,* 169 Cal.App.4th 912, as authority for their argument that non-resource-dependent uses, such as residences, are absolutely prohibited within 100 feet of the riparian resource. *McAllister* does not stand for such a proposition and is clearly distinguishable. In *McAllister,* the Court of Appeal held that non-resource-dependent projects, such as houses, may not be allowed within *environmentally sensitive habitat areas,* absent express findings that denial of the proposed use would constitute a taking. (*Id.* at pp. 918–919.) The Monterey County Local Coastal Program incorporated the development restrictions of section 30240, subdivision (a), restricting development to resource-dependent uses that do not significantly disrupt habitat values, into section 3.3 of the Big Sur Land Use Plan. (169 Cal.App.4th at pp. 931–932.) The proposed residence was "located in, and had the potential to disrupt," two environmentally sensitive habitat areas—specifically, the Smith's blue butterfly habitat and the coastal bluff scrub

habitat. (*Id.* at p. 925; see *id.* at pp. 918, 924–927, 929, 931–933.) Even if it did not significantly disrupt habitat values, the proposed residence could not be found to be dependent on the resources that render the area a protected habitat. (*Id.* at pp. 933, 935.) In *McAllister*, the Coastal Commission conceded on appeal that " 'strict application of the [Monterey County Local Coastal Program] [environmentally sensitive habitat area] policies would require a decision to *deny* the proposed residential development because it is not a resource-dependent use.' (Italics added.)" (*Id.* at p. 933.) In contrast to ·*McAllister*, in this case there is no claim that the Stars' residential project will extend into an environmentally sensitive habitat under either the Coastal Act or the Local Coastal Program. That the residence is not a "resource-dependent" development is thus irrelevant to the actions of the county in approving the development pursuant to attachment "M" and to the Coastal Commission's action regarding the appeal.

 The Board did not abuse its discretion in approving permits for the project; allowing development within the 100-foot buffer zone and maintaining a minimum 50-foot buffer.

## COASTAL COMMISSION FINDING OF NO "SUBSTANTIAL ISSUE" .

Appellants contend that substantial issues were presented by their appeal to the Coastal Commission and that it erred by failing to hear them. We disagree.

 The Board's approval of the coastal permit and the use permit was appealable to the Coastal Commission, because the approved house is within 100 feet of a stream. (§ 30603, subd. (a)(2).)[13] The grounds for an appeal pursuant to subdivision (a) are limited to "an allegation that the development does not conform to the standards set forth in the certified local coastal program . . . ." (§ 30603, subd. (b)(1).) Section 30625, subdivision (b) of the Coastal Act requires the Coastal Commission to hear an appeal, *unless it determines that no substantial issue is raised by the appeal.*[14] (*Alberstone, supra*, 169 Cal.App.4th at p. 863.) Appellants contend the appeal raised a

---

[13] "(a) After certification of its local coastal program, an action taken by a local government on a coastal development permit application may be appealed to the commission for only the following types of developments: [¶] . . . [¶] (2) Developments approved by the local government . . . that are located . . . within 100 feet of any . . . stream . . . ." (§ 30603, subd. (a)(2).)

[14] "(b) The commission shall hear an appeal unless it determines the following: [¶] . . . [¶] (2) With respect to appeals to the commission after certification of a local coastal program, that no substantial issue exists with respect to the grounds on which an appeal has been filed pursuant to Section 30603." (§ 30625, subd. (b)(2).)

substantial issue as to the Board's asserted violation of LCP Policy 9 in allowing development within 100 feet of the riparian resource.

As observed in *Alberstone, supra,* 169 Cal.App.4th 859, "the question here is not whether appellants' appeal raises *any issue* but whether it raises *a substantial one.* A substantial issue is defined as one that presents a 'significant question' as to conformity with the certified local coastal program. (Cal. Code Regs., tit. 14, § 13115.) We review the Commission's determination of whether a substantial issue has been raised for abuse of discretion; we grant broad deference to the Commission's interpretation of the [local coastal program] since it is well established that great weight must be given to the administrative construction of those charged with the enforcement and interpretation of a statute. [Citations.] We will not depart from the Commission's interpretation unless it is clearly erroneous. [Citation.]" (*Id.* at pp. 863–864, fn. omitted.) Mindful of these principles, we agree with the Coastal Commission that appellants have not raised a substantial issue that required the Coastal Commission to engage in de novo review of the Stars' application.

A. *No significant question as to conformity with the Local Coastal Program*

In determining whether an appeal raises a "significant question" as to conformity with the certified local coastal program, the Coastal Commission's staff report related that the Commission has in previous appeals been guided by five factors:

"1. The degree of factual and legal support for the local government's decision that the development is consistent or inconsistent with the certified [local coastal program] and with the public access policies of the Coastal Act;

"2. The extent and scope of the development as approved or denied by the local government;

"3. The significance of the coastal resources affected by the decision;

"4. The precedential value of the local government's decision for future interpretations of its [local coastal program]; and

"5. Whether the appeal raises only local issues, or those of regional or statewide significance."

The Commission staff agreed with the Stars and the county that the Local Coastal Plan policies (including LCP Policy 9) "must be looked at in conjunction with the Implementation Plan . . . when determining appropriate

buffer widths. Attachment 'M' . . . of the certified Administrative Manual was developed and certified to further interpret and implement the riparian policies of the [Local Coastal Plan] by setting criteria for establishing buffer widths." (Coastal Com. staff report, p. 11.) The Commission staff report analyzed the project under the seven standards enumerated in attachment "M" and used by the Board in determining to issue the permits. The staff report concluded that the county had a "high degree of factual and legal support for its decision" to approve the reduced buffer and "no substantial issue is raised with regard to the conformance of the project as approved with the provisions of [LCP] Policy 9 and Attachment 'M' . . . Therefore, the Commission finds that the contention raised by the appellants does not raise a substantial issue of conformance of the approved project with the provisions of the Certified Local Coastal Program."

Appellants claim that Commission staff "misinterpreted" LCP Policy 9 as they "failed to remember that residential development is not dependent on riparian resources as the Commission told the County in reference to appellants' similar application for a setback reduction . . . ." Appellants fail to cite to any part of the record indicating the Coastal Commission staff recommendation or the Commission approval was based on the erroneous conclusion that the project was "dependent on riparian resources." Rather, the record is clear that the recommendation was based upon application of the exception set forth in attachment "M" and the criteria used by the Coastal Commission in determining whether an appeal presents a "substantial issue."

The Coastal Commission maintains that, even assuming the Board's approval of the permits were viewed as a technical violation of LCP Policy 9 (notwithstanding the applicability of the attachment "M" factors to the permit decisions), the Coastal Commission properly concluded the appeal raised no substantial issue under the five factors used by it to make such a determination. The Coastal Commission analysis determined there was a high degree of support for the county's determination of the adequacy of a 50-foot buffer and the lack of any impact on the riparian habitat and the consequent determination that the development was consistent with the Sonoma County Local Coastal Program. The development was a small single-family residence and garage and affected only one parcel in that single subdivision. The county's decision on the Star property is not precedential, as evidenced by the Board's determination that a taking would result on the Star property if the buffer were not reduced and its prior determination that a taking would not result on the adjacent larger parcel if the 100-foot buffer were maintained as to that parcel. The issue is purely local, involving a single property and does not raise regional or statewide concerns. Because attachment "M" requires careful consideration of a wide variety of site-specific factors before the Board may determine that a buffer of less than 100 feet is adequate to protect riparian resources, the appeal did not raise precedential concerns that

could threaten riparian resources elsewhere in the county. The limited applicability of the issue involved in appellants' appeal of the Star permits also supports the Coastal Commission's determination that the appeal raised no substantial issue and its refusal to take jurisdiction over the matter.

B. *Challenge to the Board's "takings" finding*

Appellants' challenge to the county's "takings" finding did not raise a substantial issue of conformance with the certified Local Coastal Program. The Coastal Commission staff report concluded that the county's "takings" finding was not necessary, because the approved development was consistent with the Local Coastal Program standards for determining appropriate buffer widths and the county, therefore, had a high degree of legal and factual support for its decision to approve the project. We agree with the Coastal Commission that the takings finding was not necessary where the approved project was consistent with the Local Coastal Program. The conclusion that the Stars would be denied all reasonable use of their property if the permits were not issued allowing the reduced buffer was an additional independent reason supporting the Board's decision. Even if appellants were correct that that determination was not supported by an adequate takings analysis, the result would be the same, as the project was consistent with the Local Coastal Program. The Commission therefore had no occasion to investigate whether the legally superfluous takings finding was warranted. The Coastal Commission determination that appellants' challenge to the Board's takings finding did not raise a substantial issue was not clearly erroneous and appellants have failed to show the Commission abused its discretion.

As the takings issue was unnecessary either to support the Board's decision or the Coastal Commission's no substantial issue determination, we need not resolve appellant's challenge to the takings analysis on this appeal.

## CEQA CLAIMS

Appellants contend that both the county and the Coastal Commission violated CEQA in approving the project. Appellants acknowledge that because the project is a single-family residence, it is normally exempted from CEQA. (Regs., § 15303, subd. (a).) However, they contend that the Star residence project will impact riparian wildlife and that approval will open the door to successive projects of the same type in the same area. Appellants

maintain, therefore, that this project is not exempt because it has potentially cumulative effects on sensitive riparian resources. (Regs., § 15300.2, subds. (b) & (c).)

## A. *CEQA did not apply to the Coastal Commission's "no substantial issue" determination*

■ At the outset, we note that CEQA does not apply to the Coastal Commission's determination that appellants' appeal did not raise a substantial issue. Section 21080.5 exempts the Coastal Commission's regulatory program from CEQA requirements for preparation of an environmental impact report (EIR). (See *Strother v. California Coastal Com.* (2009) 173 Cal.App.4th 873, 877 [92 Cal.Rptr.3d 831].) As to the regulation of private development, CEQA applies only to discretionary approvals of projects. (§ 21065, subd. (c).) Had it heard the appeal, the Coastal Commission's de novo review process would have constituted the functional equivalent of an EIR under CEQA. (§ 21080.5, subd. (a); Regs., § 15251, subd. (c).) In finding "no substantial issue," the Coastal Commission did not "approve" the project, they simply left the county's decision undisturbed. Furthermore, were it determined that the Commission's finding of no substantial issue constituted an approval of the project within the meaning of CEQA, the Commission still would have been limited to reviewing the conformity of the local government's actions to the certified local coastal program or to the public access policies of the Coastal Act. (§ 30603, subd. (b)(1).) The Coastal Commission lacks jurisdiction to review a local government's compliance with CEQA. Requiring the Coastal Commission to conduct a CEQA review of project alternatives and mitigation measures would be incompatible with the statutory process and would effectively require the Coastal Commission to engage in de novo review of every appeal, despite the Coastal Act's express authorization for the Commission to decline jurisdiction of appeals that fail to raise a substantial issue relating to conformity with a local coastal program.

Even assuming for the sake of argument that the CEQA categorical exemption issue could have been addressed by the Coastal Commission, appellants' failure to raise it in that proceeding constituted a failure to exhaust administrative remedies.

## B. *Exhaustion of administrative remedies*

We agree with respondents Stars and the Board that appellants have failed to exhaust their administrative remedies in these circumstances by failing to

raise any issue regarding the purported violation of CEQA before the county at any stage, despite ample notice that county staff considered the project exempt and several opportunities before the BZA and before the Board to raise any objection or argument with respect to the categorical exemption. (§ 21177, subd. (a).)[15]

As Justice Robie explained in *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603 [91 Cal.Rptr.3d 571] (*California Native Plant*): " ' "Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." [Citation.] Subdivision (a) of CEQA section 21177 sets forth the exhaustion requirement . . . . That requirement is satisfied if "the alleged grounds for noncompliance with [CEQA] were presented . . . by any person during the public comment period provided by [CEQA] or prior to the close of the public hearing on the project before the issuance of the notice of determination." ' (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 791–792 [39 Cal.Rptr.3d 189], fn. & italics omitted.) [¶] 'The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review. [Citation.] The decisionmaking body " 'is entitled to learn the contentions of interested parties before litigation is instituted.' " ' (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 384 [110 Cal.Rptr.2d 579].)

"To exhaust administrative remedies, '[m]ore is obviously required' than 'generalized environmental comments at public hearings.' (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197 [200 Cal.Rptr. 855].) 'On the other hand, less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding. This is because " '[i]n administrative proceedings, [parties] generally are not represented by counsel. To hold such parties to knowledge of the technical rules of evidence and to the penalty of waiver for failure to make a timely

---

[15] Section 21177 provides in relevant part as follows:

"(a) No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination. [¶] . . . [¶]

"(e) This section does not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, or if the public agency failed to give the notice required by law."

and specific objection would be unfair to them.' [Citation.] It is no hardship, however, to require a layman to make known what facts are contested." ' [Citation.]" (*California Native Plant, supra,* 172 Cal.App.4th at pp. 615–616.)

■ We recognize that "[a]s a general rule, the exhaustion requirement does not apply when the administrative procedure did not provide for a public hearing or other opportunity for members of the public to raise objections before project approval. ([§ 21177, subd. (e)])." (2 Kostka & Zischke, Practice Under the California Environmental Quality Act (2d ed. 2010) § 23.105, p. 1248 (rel. 2/09) (Kostka and Zischke).) This may often be the case with respect to a public agency finding that a project was *exempt* from CEQA, as was the case here. As Kostka and Zischke explain: "[A] public agency may find that a project is exempt from CEQA, and thus file a notice of exemption, *without holding a hearing or otherwise giving members of the public an opportunity to comment. . . . When no opportunity to express objections to a claimed exemption is provided by the agency, the exhaustion requirement does not apply.* [Citations.]" (*Ibid.,* italics added, citing *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810 [17 Cal.Rptr.2d 766]; *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1210 [61 Cal.Rptr.2d 447] [exhaustion requirement applies only when CEQA provides public comment period or there is public agency hearing before notice of agency determination is filed]; *Endangered Habitats League, Inc. v. State Water Resources Control Bd.* (1997) 63 Cal.App.4th 227 [73 Cal.Rptr.2d 388] [exhaustion not required, because county gave no notice and provided no opportunity to be heard orally or in writing before approving the project design].)

In the instant case, there was ample notice before the BZA public hearing and before the public hearing on the appeal of the BZA determination to the Board that the project was being considered under the "Class 3" categorical exemption provision of Regulations section 15303, subdivision (a) for "one new single-family residence . . . ." The Stars and the Board contend these hearings were public hearings on environmental review required by Sonoma County's CEQA ordinance. They cite section 23A-39 of the Sonoma County Municipal Code, which states: "A public hearing shall be held on the environmental documents for every private project to which the Act and Guidelines apply if a public hearing would otherwise be required on the private project without regard to the provisions of this chapter. Except as provided in Section 23A-53, the Decision Making Body shall conduct the

public hearing, which may precede or open concurrently with the other public hearing(s) required by law on the private project." (Sonoma County Mun. Code, § 23A-39.)[16] Thus, it appears that a public hearing required for the coastal use permit also included the environmental review, which is consistent with all of the notices provided.

Appellant Hines spoke and appellants and others submitted written arguments at both hearings. Appellants point to nothing in the record of proceedings before the BZA, the Board or the Coastal Commission showing that appellants or others raised any issue as to the applicability of the CEQA categorical exemption before or during those proceedings. In these circumstances, we conclude the administrative remedy exhaustion requirement of section 21177, subdivision (a), is triggered and the exception of subdivision (e) to that requirement does not apply. Appellants' CEQA claim is barred by their failure to exhaust their administrative remedies.

C. *CEQA exemption properly found in any event*

Were we to conclude that appellants were not required to exhaust administrative remedies, we would still conclude that the Board properly determined the project to be exempt under CEQA.

■■■■ "[O]nce an agency 'determines, based on substantial evidence in the record, that the project falls within a categorical exemption . . . , the burden shifts to the challenging party . . . " 'to produce substantial evidence . . . .' " . . . that one of the exceptions to categorical exemption applies.' (*Santa Monica Chamber of Commerce v. City of Santa Monica* [(2002)] 101 Cal.App.4th [786,] 796 [124 Cal.Rptr.2d 731].)" (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1389 [44 Cal.Rptr.3d 128] (*San Lorenzo Valley CARE*).)

There is a split of authority on the appropriate standard of judicial review of a question of fact when the issue is whether a project that would otherwise be found categorically exempt is subject to one of three general exceptions (significant impacts due to unusual circumstances, significant cumulative impacts, and impacts on a uniquely sensitive environment) to the categorical exemptions set forth in Regulations section 15300.2, subdivisions (a) through

---

[16] With respect to "Chapter 23A-Environmental Quality Act of 1970 Implementation, Article III-Private Projects" in which this public hearing section 23A-39 falls, the planning director has the authority to determine whether the project is exempt. (Sonoma County Mun. Code, § 23A-36, subds. (a)(2) & (c).) That decision is appealable to the Board pursuant to Sonoma County Municipal Code section 23A-55.

(c).[17] (1 Kostka & Zischke, *supra*, § 5.127, p. 297; *San Lorenzo Valley CARE, supra*, 139 Cal.App.4th at p. 1390; *Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1259 [89 Cal.Rptr.2d 233].) "Some courts have relied on cases involving review of a negative declaration, holding that a finding of categorical exemption cannot be sustained if there is a 'fair argument' based on substantial evidence that the project will have significant environmental impacts, even where the agency is presented with substantial evidence to the contrary. [Citation.] Other courts apply an ordinary substantial evidence test . . . , deferring to the express or implied findings of the local agency that has found a categorical exemption applicable. [Citations.]" (*Fairbank v. City of Mill Valley*, at pp. 1259–1260; accord, *San Lorenzo Valley CARE*, at p. 1390; see 1 Kostka & Zischke, § 5.127, pp. 297–299 (rel. 2/09).) We need not resolve that dispute here.

Even applying the deferential "fair argument standard," there is no substantial evidence in this record that the project would have a significant effect on the environment due to unusual circumstances or that the cumulative impact of successive projects of the same type in the same place, over time is significant. (See Regs., § 15300.2, subds. (b) & (c).)

■ " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project[,] including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. . . ." (Regs., § 15382.) "Moreover, for the exception to apply, there must be substantial evidence of qualifying environmental impacts. Under the rule generally applicable to CEQA issues, 'substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact.' (§ 21080, subd. (e)(1); see also [Regs.], § 15384, subd. (b).) 'Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative, [or] evidence that is clearly inaccurate or erroneous . . .' (§ 21080,

[17] Regulations section 15300.2 provides in relevant part:

"(a) Location. Classes 3, 4, 5, 6, and 11 are qualified by consideration of where the project is to be located—a project that is ordinarily insignificant in its impact on the environment may in a particularly sensitive environment be significant. Therefore, these classes are considered to apply in all instances, except where the project may impact on an environmental resource of hazardous or critical concern where designated, precisely mapped, and officially adopted pursuant to law by federal, state, or local agencies.

"(b) Cumulative Impact. All exemptions for these classes are inapplicable when the cumulative impact of successive projects of the same type in the same place, over time is significant.

"(c) Significant Effect. A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."

subd. (e)(2); see also [Regs.], § 15384, subd. (a).)" (*San Lorenzo Valley CARE, supra*, 139 Cal.App.4th at p. 1390.) "[A] 'party challenging an agency's exemption decision must produce substantial evidence that the project has the potential for a substantial adverse environmental impact.' [Citation.]" (*Id.* at p. 1389.) Appellants have pointed to no evidence *in the record* that construction of the modest single-family residence within 50 feet of the riparian habitat will have any significant adverse effect on the environment.[18]

Rather, appellants contend that "the cumulative impact of successive projects of the same type in the same place, over time is significant" (Regs., § 15300.2, subd. (b)), because there are "at least 14 vacant lots on both sides of the riparian zone." Appellants speculate that once one landowner in the development is allowed to encroach on the riparian habitat, others will want to do the same, resulting in homes being built on those vacant lots within the 100-foot riparian setback.

 As was observed in *Magan v. County of Kings* (2002) 105 Cal.App.4th 468, 477 [129 Cal.Rptr.2d 344]: "The claims are based entirely on speculation. Opinions which state 'nothing more than "it is reasonable to assume" that something "potentially . . . may occur" ' do not constitute substantial evidence 'necessary to invoke an exception to a categorical exemption.' [Citation.]" Moreover, having produced no substantial evidence from which it could be argued that this modest single-family home will cause an environmental impact, appellants' speculation that many others may also seek to build within the buffer zone and that the county would permit them to do so does not provide substantial evidence of significant cumulative impacts. "When there is no substantial evidence of any individual potentially significant effect by a project under review, the lead agency may reasonably conclude the effects of the project will not be cumulatively considerable, and it need not require an EIR on this basis. (*Leonoff v. Monterey County Bd. of*

---

[18] In their reply brief, appellants point to a letter to Cynthia Demidovich of the Sonoma County Permit and Resource Management Department from creekside residents (the Johnsons) who stated that since 1981, they had witnessed the creek flood, the channel change, pollution of the creek, and the continuation of erosion. They expressed concern that the creek was home to many wildlife species and that disturbance to the health of the creek would have a negative impact. Nothing in the letter provides substantial evidence that construction of this project would have a significant adverse impact on the creek or the riparian resource as a whole, nor does it provide more than speculation that the approval would establish a precedent, leading to a significant cumulative impact of successive projects of this type. Similarly, substantial evidence of adverse impact or substantial cumulative impacts excepting the project from the categorical exemption is not provided by appellants' own e-mail to Demidovich stating that on visits to their own adjacent lot, appellants have seen deer and a fox and that "[t]his wildlife and the beautiful open spaces between our homes will not survive if homeowners are allowed to whittle away the green space in our community."

*Supervisors* (1990) 222 Cal.App.3d 1337, 1358 [272 Cal.Rptr. 372].)" (*Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 701–702 [27 Cal.Rptr.3d 223] [merely listing other projects occurring in the area that may cause significant cumulative impacts is not evidence that the activity at issue will have impacts or that the impacts are cumulatively considerable].)

Unable to find substantial evidence in the record before the Board, appellants argue that their stay motion in this court illustrated that the early stages of construction for the project have impacted wildlife and that future projects would pose "potentially significant cumulative effects on sensitive riparian resources." However, it is well established that in cases such as this, "[w]hen an agency's CEQA determination is reviewed by administrative mandamus under [Code of Civil Procedure section] 1094.5, in accordance with [section] 21168, judicial review is limited to the evidence . . . of the agency proceedings." (2 Kostka & Zischke, *supra*, § 23.48, p. 1188 (rel. 1/10).)

D. *No need to address alternatives or mitigation measures under CEQA in this case*

Appellants' claim that the county and the Commission violated CEQA by failing to address alternatives or incorporate measures mitigating asserted significant adverse impacts of the project (§§ 21002, 21080.5, subd. (d)(2)(A)) falls with their failure to exhaust administrative resources as to any CEQA claim and, alternatively, with their failure to produce substantial evidence of the existence of the claimed significant adverse impacts.[19] Appellants cite no authority to support the proposition that alternatives must be considered or mitigation measures imposed for projects that properly have been determined categorically exempt and as to which no exception applies.

---

[19] Section 21002 provides in part: "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available *which would substantially lessen the significant environmental effects of such projects*, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures *which will avoid or substantially lessen such significant effects. . . .*" (Italics added.)

Section 21080.5, subdivision (d)(2)(A) provides, in part, that to qualify for certification as a certified regulatory program, the rules and regulations adopted by the administering agency for the regulatory program must "[r]equire that an activity will not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available *that would substantially lessen a significant adverse effect that the activity may have on the environment.*" (Italics added.)

## DISPOSITION

The judgment denying petition for writ of mandate is affirmed. Real parties in interest, the Stars, shall recover their costs on appeal.

Haerle, J., and Lambden, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 13, 2010, S185805.