Filed 8/17/20  Stein v. Alameda County Waste etc. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ANTOINETTE W. STEIN et al., | |
| Plaintiffs and Appellants, | A154804 |
| v. | |
| ALAMEDA COUNTY WASTE MANAGEMENT AUTHORITY, | (Alameda County Super. Ct. No. RG17858423) |
| Defendant and Respondent, | |
| WASTE MANAGEMENT OF ALAMEDA, INC. et al., | |
| Real Parties In Interest and Respondents. | |

Antoinette W. Stein and Arthur R. Boone, III, have separately appealed from the judgment denying their petition for a writ of mandate directing Alameda County Waste Management Authority (County Waste) to set aside its approval of a waste composting process inside an existing facility for alleged noncompliance with the California Environmental Quality Act (Pub. Resources Code[1] § 21000 et seq. (CEQA).)  We affirm.

---

[1] Statutory references are to this code unless otherwise indicated.

1

# BACKGROUND

The trial court explained its reasoning at length, first in a 33-page Order Denying Petition for Writ of Mandate, and then with a 21-page Order Denying Motion to Vacate Judgment and Enter New Judgment or, alternatively, for a New Trial. The following narrative is taken from these documents, and quoted excerpts (with record citations omitted) are in them.

Real Party in Interest Waste Management of Alameda County, Inc. (Waste Management) owns and operates a 53-acre facility (called the DSTS in the trial court's documents, this being an acronym for Davis Street Transfer Station) in San Leandro. In 1998, Real Party in Interest City of San Leandro made its initial study of the project, adopted a mitigated negative declaration,[2] and issued Waste Management a permit to accept up to 5,600 tons per day (tpd) of waste at the facility. Waste Management "then built various facilities at the DSTS."

In 2011, the City adopted a negative declaration and approved a permit, in the trial court's words, for "improvements" in "the construction of buildings and installation of equipment for composting and waste diversion at the DSTS."[3] The "improvements" were two-fold.

---

[2] The administrative record leaves no doubt that what was adopted was a mitigated negative declaration. However, this document was universally called a straight negative declaration by the trial court in the orders that will be extensively quoted herein. Because the distinction is without practical significance, at this time and for purposes of this appeal, we made the editorial decision not to disfigure those excerpts with innumerable "[*sic*]"s after the words "negative declaration." We also note the City itself occasionally called the document adopted a negative declaration with no qualifier.

[3] Although the permit refers to a mitigated negative declaration, the actual document clearly identifies it as a negative declaration. CEQA defines a negative declaration as "a written statement briefly describing the reasons

2

"1.  Food Waste/Organic Recycling Facility (approximately 62,000 square feet).  The Recycling Facility would 'be capable of receiving and processing between 1,000 to 1,300 tpd of waste from residential and commercial generators' and '[a]n estimated 600 tpd of food and mixed organics [was] expected to be recovered for compositing.'

"2.  Food Waste/Organics/Green Waste Compost Facility (approximately 200,000 square feet).  The Compost Facility would 'process approximately 1,000 tpd of food and green wastes along with other mixed organics' and '[b]etween 250 and 350 tpd [would] be composted on site, and the rest of the material [would] be shipped for compositing off site.'  The anaerobic process would take place in an enclosed tunnel.  The resulting methane gas would be a renewable energy source.  The resulting liquid percolate would be recycled as part of the compost process."

In 2017, Waste Management submitted a "revised application" to County Waste.  "The proposed changes were:

"1.  The Food Waste/Organic Recycling Facility would be renamed the Organic Materials Recovery Facility ('OMRF') and remain approximately 62,000 square feet.  The OMRF would be automated.  The new facility would be capable of processing up to 300,000 tons per year (1,500 tpd assuming 200 work days per year) of waste and would be expected to recover 600,000 tpy [tons per year] of organics (300 tpd assuming 200 work days per year) for composting.

"2.  Food Waste/Organics/Green Waste Compost Facility would be divided into the Organics Materials Composting Facility (135,000 square

_____

that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report." (§ 21064.)

feet) and the Organics Digester Facility (65,000 square feet), and would remain a total of approximately 200,000 square feet.

"a. The Organics Materials Composting Facility ('OMCF') would process up to 165,000 tpy (550 tpd assuming 300 work days per year).

"b. The Organics Digester Facility ('Digester') would process up to an additional 40,000 tpy of organic materials (133 tpd assuming 300 digesting days per year."

In February 2017, the Local Task Force held a meeting and apparently approved the staff report that "concluded that (1) there had been no changes to the project, and (2) further CEQA review was not required." County Waste then held two public hearings on Waste Management's application. Both Stein and Boone "attended and objected" at both hearings. At the third hearing, on March 22, 2017, County Waste "adopted Ordinance 2017-02, which (1) found no further CEQA review was required, (2) amended the ColWMP [Countywide Integrated Waste Management Plan], and (3) found that the project was in conformance [*sic*: conformity] with ColWMP as amended (the '2017 Conformance Decision')."[4]

---

[4] The Local Task Force is an advisory body to County Waste, which has responsibility for administering Alameda's Countywide Integrated Waste Management Plan by way of periodic review and revision. (Cal. Code Regs., tit. 14, §§ 18777, 18781, 18785, 18788.) The plan is required by the Waste Management Act (originally the Integrated Waste Management Act of 1989, § 40000 et seq.), whose purposes are "to reduce, recycle and reuse solid waste generated in the state to the maximum extent feasible in an efficient and cost-effective manner to conserve water, energy and other natural resources, to protect the environment, to improve regulation of existing solid waste landfills, to ensure that new solid waste landfills are environmentally sound, to improve permitting procedures for solid waste management facilities, and to specify the responsibilities of local governments to develop and implement integrated waste management programs." (§ 40052.) As is apparent from this language, "the Waste Management Act looks to a partnership between

4

Although this Ordinance is the target of Stein and Boone, several subsequent follow-up events are pertinent. First, County Waste "amended the ColWMP to add the project at the DSTS to the ColWMP's list of System Components. Condition of Approval No. 5 was that the facilities would be constructed and operated in compliance with the assumptions in the 2011 [negative declaration]." Second, the Alameda County Department of Environmental Health "was required to," and did, "make a discretionary decision to approve a [permit] for the OMF." Third, the Bay Area Air Quality Management District (BAAQMD) "was required to," and did, "make a discretionary decision to approve an 'Authority to Construct' and 'Permit to Operate' the OMRF."

### The Trial Court's Decision

After taking care of various housekeeping matters, the trial court (Hon. Ronni B. MacLaren) got down to business.

The first issue was whether County Waste's "determination that the 2011 [negative declaration] retained informational value for the 2017 Resolution [that, is, the Ordinance]".

"CEQA requires public agencies to undertake environmental review before making decisions. A public agency can comply with CEQA by approving a negative declaration, a mitigated negative declaration, or [an] environmental impact report. If there are subsequent changes to the project, then the public agency must determine whether to conduct subsequent environmental review.

---

the state and local governments, with the latter retaining a substantial measure of regulatory independence and authority." (*Waste Resource Technologies v. Department of Public Health* (1994) 23 Cal.App.4th 299, 306.)

5

"The first step in this process is to determine the continuing usefulness of the earlier CEQA review. *Friends of the College I* holds that the public agency must make a 'determination—whether implicit or explicit—that the original environmental document retains some informational value.' ([*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist. I* (2016)] 1 Cal.5th [937,] 951.)  The inquiry 'is a predominantly factual question . . . for the agency to answer in the first instance, drawing on its particular expertise.' (*Id.* at p. 953.)  The Court emphasized that 'occasions when a court finds no substantial evidence to support an agency's decision to proceed under CEQA's subsequent review provisions will be rare, and rightly so:  "a court should tread with extraordinary care" before reversing an agency's determination, whether implicit or explicit, that its initial environmental document retains some relevance to the decision-making process.' (*Id.* at p. 951.)

"[County Waste] made an implicit finding that the 2011 [negative declaration] retains some informational value.  [County Waste] compared the 2011 [negative declaration] with the 2017 proposed Conformance Finding and reached this implicit conclusion.  The court has independently compared the 2011 [negative declaration] and the 2017 Conformance Decision and finds that substantial evidence supports this conclusion.  Specifically:

"1.  The footprint of the buildings remains substantially the same.

"2.  The volume of compost to be processed and sorted remains substantially the same.

"3.  The volume of compost to be produced onsite might have changed.

"4.  The composting process remains substantially the same.

"5.  The anaerobic digestion process remains substantially the same.

6

"[County Waste's] decision to rely on the 2011 [negative declaration] was supported by substantial evidence and it properly then moved to the section 21166 evaluation of whether CEQA permitted or required further environmental review."

"When the original CEQA document has continuing informational value, then the public agency must determine whether any proposed changes in the project, changes in the circumstances, or changes in available information are so substantial that CEQA requires additional environmental review. [¶] . . . [¶]

"If the initial CEQA review was an environmental impact report ('EIR'), then the interests of finality are favored over the policy of favoring public comment and environmental examination. . . .

"In contrast, if the initial CEQA review was a negative declaration or a mitigated negative declaration, then the public agency has not conducted a thorough environmental review and the court reviews the public agency's subsequent review determination for whether the record contains evidence that the changes to the project might have a significant environmental impact not previously considered. (*Friends of the College I*, *supra*, 1 Cal.5th at p. 958 . . . .) The court reviews a public agency's findings regarding the existence of 'substantial changes' that will involve 'new significant environmental effects or a substantial increase in the severity of previously identified significant effects' . . . using the 'fair argument test.' [Citation.] Under the fair argument test, if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency must prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect. [Citations.]"

The court then addressed Stein's claim whether there was a fair argument that the volume of material to be "processed, composted and digested onsite" constituted a substantial change, or new or increased environmental effects.

After a lengthy discussion of the administrative record, the trial court purported to make findings that "there is no substantial evidence of a change in the total tons per day to be *processed* onsite," but "there is substantial evidence of a change in the total tons per day to be *composted and digested* onsite." Moreover, "[t]he court finds there is substantial evidence in the administrative record to support a fair argument that the project as considered by [County Waste] in 2017 did not limit the onsite composting to 350 tpd."

However, "[a]pplying the fair argument standard, and assuming that the volume of the composting and digesting onsite increases from 350 tpd to 1,000 tpd, the court finds there is no substantial evidence that the increase in volume would have a significant environmental impact. Regarding water quality, the 2011 [negative declaration] states: 'The proposed Project includes tanks to store the percolate liquid, which is then used as makeup to initialize the compost process forming a closed loop system. Any excess water will be conveyed to the sanitary sewer.' A significant increase in the tons per day of onsite compositing on its face presents a fair argument that there will be a corresponding increase in the percolate liquid, which would then lead to an increase in that water to 'be conveyed to the sanitary sewer.'

"There is, however, no fair argument that an increase in the volume of water conveyed to the sanitary sewer might have a significant environmental effect. First, 'percolate liquid' and 'water' are not synonymous, and it is water that would be conveyed to the sewer. The 2011 [negative declaration] states

8

that the percolate liquid is 'collected and stored in tanks' and is 'then recycled as part of the compost process.' The 2011 [negative declaration] also states that the percolate liquid is part of a 'closed loop system.' Second, the water would be conveyed to the sanitary sewer, and would therefore be treated in a waste water plant. . . . If the water were not conveyed to a sanitary sewer, and were instead treated as storm water, then it would be subject to the specific requirements for storm water treatment in the 2011 [negative declaration]. Third, Petitioner Stein did not raise the issue that '[a]ny excess water will be conveyed to the sanitary sewer' in the administrative process, and she therefore failed to exhaust her administrative remedies on this issue."

"Petitioner Stein also argues that the increase in the volume of liquid will have an environmental effect because there is no mention of the percolate liquid storage tanks. As discussed below, the number and location of the storage tanks does not change from 2011 to 2017. The storage of the liquid in the tanks has no environmental effect—it is the release that has a potential environmental effect.

"Regarding air quality, a significant increase in the tons per day of onsite composting on its face appears to present a fair argument that there will be a corresponding effect on air quality. But, as discussed below, the composting and digesting onsite will take place in enclosed facilities with filters, and therefore any effect on air quality is speculative. Regarding vehicle traffic, the total volume of waste processed will not increase above 1,000 tpd and thus the possible increase in the volume of composted and digested material would not increase vehicle traffic. Petitioner's air quality and vehicle traffic concerns are speculative and not supported by evidence."

Next, "Stein asserts that the 2017 changes to the DSTS changed the sorting process by replacing a hand-sorting process with an automated process. The court finds that there was a change in the sorting process, but that it would not require additional environmental review.

"The 2011 [negative declaration] states that the facility will receive only separated green waste, which would be manually sorted and transferred to the Compost facility to be mixed with other green waste. Under that procedure, household hazardous waste would be identified and removed before anaerobic digestion and composting

"The 2017 Conformance Decision states that the facility will have a mechanical hydro-pulping process to separate organic and inorganic materials from the waste materials that come to the DSTS. After separation in the hydro-pulping process, '[t]he organic materials recovered from the OMRF will be directly conveyed to the adjacent Composting and Digester facility buildings for processing.' The inorganic materials that can be recycled 'including aluminum, metals, plastics, and glass will be shipped off-site for recycling.'

"Applying the fair argument standard, the court finds there is no substantial evidence that the change in the sorting process may have any environmental impact. The change from hand-sorting to mechanical-sorting by itself is immaterial for CEQA purposes.

"The change in the sorting process is possibly material for CEQA purposes to the extent that it 'may' result in inorganic and hazardous material in the digestive process, which in turn 'may' have an adverse environmental impact. Petitioner Stein has not, however, identified any substantial evidence that hand separation does a better job than the proposed mechanical hydro-pulping process at separating organic from inorganic

10

materials.  Petitioner's speculation is not substantial evidence.  [Citation.]  At the 2/9/17 meeting, [Waste Management] employee Shawn Tackitt stated that the mechanical hydro-pulping process is an advanced process designed to separate and remove contaminants before the composting and digestion process."

"Petitioner Stein asserts that the 2017 Conformation Decision changes the composting process by replacing a three-step compositing process with a different process.  The court finds there was no significant change in the composting and digestion process.

"The 2011 [negative declaration] states that the composting will be a three-step compositing process consisting of (1) anaerobic digestion in an airtight tunnel, followed by (2) aerobic digestion in a secondary tunnel, followed by (3) processing to separate fine, medium, and large particles.

"The 2017 Conformance Decision states that the facility will (1) automatically process waste in the OMRF to separate organic and recyclable materials from landfill waste and then send the organic waste to either (2) the aerobic composting facility or (3) the anaerobic digesting facility.

"The composting and digesting processes described in the 2011 [negative declaration] and in the 2017 Conformance Decision are both in closed facilities.  The staff report for the 2017 decision states:

"1.  'The Composting facility will be a 135,000 square foot fully-enclosed operation.  The building will house the entire composting process, and will be operated under a negative air system with exhaust vented through a biofilter to control potential odors and mitigate emissions from the composting process.'

"2. 'The Digester facility will be an anaerobic process which will occur in a 65,000 square foot building. . . . . The digester facility will be fully-enclosed allowing for the collection of biomethane from the digestion process. . . .'

"Applying the fair argument standard, the court finds there is no substantial evidence that the change in the composting and digestion process may have any environmental impact.

"Regarding air quality effects, both the 2011 [negative declaration] and the 2017 Conformance Decision require that the composting and digestion take place in closed buildings. At the meetings on 2/9/17 and 2/22/17, Petitioner Stein, who is an environmental engineer with a Ph.D. in air pollution control, expressed concern about odor from the facility, expressed concern about increased volume, identified the CalEPA and BAAQMD reports, and expressed concern that San Leandro is in a high air pollution area. Expressions of concern and requests to conduct further environmental review are not substantial evidence of environmental impact. [Citation.] The letter of 3/22/17 makes a conclusory allegation that the proposed project does not address air pollution. At the meetings on 2/9/17 and 2/22/17, [Waste Management] employee Shawn Tackitt explained that the composting and digestion processes each have biofilter systems to treat air exhaust. There is no substantial evidence that the change in process may result in an environmental impact regarding local or regional air quality.

"Regarding effectiveness and quality of composting and digesting, the [County Waste] staff requested and obtained information on similar recovery projects operating elsewhere. The [County Waste] staff also obtained confirmation that the anaerobic Digester was approved in the 2011 [negative declaration] and that [Waste Management] would need to obtain [a permit]

12

for the Digester.  There is no substantial evidence that the effectiveness and quality of composting and digesting may result in an environmental impact."

"Petitioner Stein asserts that the 2017 DSTS changes altered the storage of methane gas by omitting reference to the storage tanks at the DSTS.  Petitioner asserts that the 2017 Conformance Decision does not adequately disclose or discuss production, collection, storage, and use of methane.

"The 2011 [negative declaration] states that the anaerobic decomposition will produce methane, which will be collected, stored in onsite tanks, blended with methane from the now closed Oyster Bay Landfill Gas facility, and provide a renewable energy source.  The map attached to the 2011 [negative declaration] identifies the methane storage tanks by location.

"The 2017 Conformance Decision does not address how the facility will manage methane gas.  The [County Waste] staff report and the ColWMP amendment both state only that '[t]he digester facility will be fully-enclosed allowing for the collection of biomethane from the digestion process' and '[t]he gas will be either utilized for on-site production of renewable energy to power the Davis Street operations, or utilized as vehicle grade renewable natural gas to power [Waste Management's] waste hauling fleet.'  The map presented by [Waste Management] via PowerPoint at the 2/22/17 meeting identifies the methane storage tanks by location, and there is no change in location.

"Neither the [Waste Management] application nor the [County Waste] staff report addressed how the facility will manage percolate liquid.  The map presented by [Waste Management] via PowerPoint at the 2/22/17 meeting identifies the percolate liquid storage tanks by location, and there is no change in location.

"Applying the fair argument standard, the court finds there is no substantial evidence that any change in the storage of percolate liquid may have any environmental impact. As with the methane, Petitioner's argument is that there was no disclosure or discussion of how the facility will manage percolate liquid. As with the methane argument, Petitioner's speculation about a change is not substantial evidence, the absence of any identified change means the project remains the same as described in the 2011 [negative declaration] and [County Waste's] 2017 Conformance Decision at Condition No. 5 and 8 requires [Waste Management]to comply with the assumptions and conditions in the 2011 [negative declaration]."

The court also concluded "that Petitioners have not identified substantial evidence that raises a fair argument that '[n]ew information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available.' [Citations.]

"Petitioner Stein argues that the CalEPA and BAAQMD reports were significant new information and that under CEQA, [County Waste] was required to consider regional needs and cumulative impacts. [Citations.]

"When San Leandro adopted the 2011 [negative declaration], it did not have access to the CalEPA and BAAQMD reports. The CalEPA report is dated February 2017 and is entitled 'Identifying Disadvantaged Communities.' The BAAQMD report is dated March 2014 and is entitled 'Identifying Areas with Cumulative Impacts from Air Pollution in the San Francisco Bay Area, Version 2.'

"On 3/22/17, the date of the last hearing and the date [County Waste] was to vote on the DSTS issue, Petitioner Stein referenced the CalEPA and BAAQMD reports.

14

"Applying the fair argument standard, the court finds there is no substantial evidence that there was new information that the project as approved by the 2011 [negative declaration] may cause an environmental impact. First, as a matter of procedure and evidence, the court finds that Petitioner Stein's reference to the CalEPA and BAAQMD reports was too vague to add the reports to the administrative record. [Citation.]

"Second, and in the alternative, the reports were not information that raised a fair argument that the 2017 DSTS project might case [sic: cause] an environmental impact. The court applies the fair argument standard based on the limited information in the administrative record. [Citation.]

"The BAAQMD report is a Community at Risk Evaluation and indicates that San Leandro is in Pollution Index range 70-80, which means that it is on the high end of the pollution indices. The BAAQMD report is a high-level report focused on the existence of air pollution by zip code. The report does not discuss causation of air pollution and does not mention the DSTS project.

"The CalEPA report builds on the BBQMD report, and concerns how best to distribute funds from California's cap-and-trade program. The CalEPA report indicates that San Leandro is on the high end of the pollution indices in the Bay Area. The CalEPA Report is a high-level report, does not discuss causation, and does not mention the DSTS project.

"The court is guided by *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, in which a city considered a generic study regarding the impact of paper bags and plastic bags and then adopted a negative declaration regarding an ordinance banning plastic bags. The Court found that the generic study did not have an 'evaluation of actual impacts attributable to the project at hand' and therefore the issues identified in the

15

generic study did not require the city to prepare an EIR. (52 Cal.4th at pp. 171–175.) In a different context, *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1396, states: 'CEQA does not require a lead agency to conduct every recommended test and perform all recommended research to evaluate the impacts of a proposed project. The fact that additional studies might be helpful does not mean that they are required.' [Citation.] CEQA does not require an agency to reopen environmental review when a commenter presents new information that does not relate directly to the proposed project even if it concerns local environmental quality generally."

In its Order Denying Motion to Vacate Judgment and Enter New Judgment or, alternatively, for a New Trial filed by Stein (but not Boone), the court began by "amending" the previous order "to clarify that the court did not make findings of fact in its review of the administrative decision by [County Waste] under Code of Civil Procedure section 1094.5."

The court initially determined that Stein was incorrect in asserting it "made in error of law" in determining that the 2011 negative declaration retained information value for County Waste's 2017 decision. "The Order of 3/20/18 correctly found that substantial evidence supported [County Waste's] determination and that it was appropriate for the agency to proceed to decide under CEQA's subsequent review provisions whether project changes would require major revisions to the original environmental document because of the involvement of new, previously unconsidered significant environmental effects."

Next the court made another "clarification":

16

"The Order of 3/20/18 interpreted Public Resources Code section 21166 and Guidelines [Cal. Code. Regs., tit. 14[5]] section 15162(a) as having two distinct clauses. The Order of 3/20/18 therefore divided the analysis into two parts: (1) whether there was substantial evidence to support a fair argument that substantial changes were proposed in the project, and (2) whether there was substantial evidence to support a fair argument that any such changes might have new significant environmental effects. The Order of 3/20/18 concluded that the administrative record contained substantial evidence to support a fair argument that substantial changes were proposed in the project, but did not contain substantial evidence to support a fair argument that any such changes might have a new significant substantial effect. Petitioner's current motion rests in large part on the two-step analysis, arguing that because [County Waste] decided in the first step there were no changes, the agency never reached the second step of whether the changes might have new significant environmental effects.

"On further consideration, the court finds that section 21166, [subdivision] (a) requires a public agency to make the single decision of whether '[s]ubstantial changes are proposed in the project which will require major revisions of the environmental impact report.' The question of whether a change is 'substantial' is determined by whether it might have a significant environmental effect that would, in turn, require major revisions of the CEQA document. For purposes of Public Resources Code section 21166 and Guidelines section 15162[, subdivision] (a), the issues of 'substantial changes'

---

[5] "All references to 'Guidelines' are to the State CEQA Guidelines, which implement the provisions of CEQA. . . . [C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390, fn. 2 (*Laurel Heights*).)

17

and 'significant environmental effect' are part of a single intertwined inquiry. (Guidelines sections 15064[, subdivisions] (b) and (e) [considerations for determining significant effect on the environment, noting that economic and social changes are not environmental changes].)"

The court then concluded that County Waste's "Board made express factual findings and a determination":

"The [County Waste] staff considered the San Leandro 2011 [negative declaration] and in a report dated February 9, 2017 stated:

" 'Authority staff has reviewed the City of San Leandro's documents for the [negative declaration]. Authority staff finds that, based on the whole record before it, the facility underwent the review required under CEQA and that the ColWMP amendment is within the scope of activities addressed by the City of San Leandro's [negative declaration]. Since preparation and adoption of the [negative declaration], there have been no changes to the project. In addition, the conditions at the project site have not changed since preparation of the [negative declaration], nor are there any other changed circumstances, or new information that has become available that would result in any new significant impacts or a substantial increase in impacts considered in the [negative declaration].'

"The [County Waste] Board was permitted to rely on the recommendations of the [County Waste] staff. [Citation.]

"The [County Waste] Board's 2017 Conformance Decision, dated March 22, 2017, makes factual findings and a CEQA determination. Section 2 (Findings) states:

" '(i) The Authority finds that the Authority Board considered all materials and testimony presented by the public, Local Task Force, applicant for the Facility, and Authority staff.'

18

" '(j)  The Authority finds that it is a Responsible Agency under CEQA, that this project underwent the required review under CEQA, and that the Authority's action is within the scope of activities addressed by the City of San Leandro's negative declaration . . . .'

" '(k)  The Authority finds that the Authority Board has independently reviewed and considered the City of San Leandro's [negative declaration].'

" '(l)  The Authority finds that since the City of San Leandro's adoption of the [negative declaration], no substantial changes have occurred and no new information or changed circumstances exist that require revisions of the [negative declaration] due to new significant environmental effects or a substantial increase in the severity of previously identified significant effects.'

"Relying on Finding 2(l), the [County Waste] Board at Section 3 (Determination) states:  'The Authority's approval of the ColWMP amendment and conformance determination, as conditioned, will have a less significant impact on the environment as documented in the [negative declaration].'

"The [County Waste] Board did more than what was required in making express findings and an express determination.  'CEQA does *not* require that findings be adopted when an agency determines that a subsequent EIR is not required.  An implied finding that a further EIR is not required under [Public Resources Code] § 21166 is sufficient as long as it is supported by substantial evidence.'  [Citation.]"

The court then moved to the subject that absorbed the most attention:

"The court finds that the administrative record does not contain substantial evidence to support a fair argument that there were substantial changes in the project that required major revisions to the San Leandro 2011

19

[negative declaration]. This presents four sub-issues: (a) when a public agency must make a section 21166 finding; (b) the investigation and analysis required by a public agency in making a section 21166 finding; (c) whether the court is permitted or required to enlarge the scope of fair argument if the agency fails to undertake the required investigation and analysis (*Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296); and (d) application of these principles to the facts of this case.

"A. When a Public Agency Must Make a Section 21166 Finding

"There is no dispute in this case that [County Waste] was required to make a CEQA determination as part of [County Waste's] independent, discretionary decision, even though the City of San Leandro was the 'lead agency' and [County Waste] was a 'responsible agency.'

"B. Investigation and Analysis Required When a Public Agency Makes a Section 21166 Finding

"It is unclear what investigation, if any, a public agency must conduct in a section 21166 inquiry. There are no clear mandates in this area. The court in *Friends of the College I*, *supra*, 1 Cal.5th at p. 956, states: 'No provision of CEQA directly addresses the subsequent environmental review obligation for projects that were initially approved via negative declaration.' In *Committee for Re-Evaluation of the T-Line Loop v. San Francisco Municipal Transportation Agency* (2016) 6 Cal.App.5th 1237, 1256, the court states: 'CEQA does not set forth any particular procedure to support an agency's decision that a new EIR is not required.'

"Procedurally, it is clear that when a single public agency is reviewing a project that it approved previously, and the project has incremental changes, the public agency is not required to conduct formal inquiries or

public hearings when conducting a section 21166 investigation and analysis. In *Committee for Re-Evaluation of the T-Line Loop v. San Francisco Municipal Transportation Agency* (2016) 6 Cal.App.5th 1237, 1256, the court stated that 'CEQA does not require an initial study or public hearing in these circumstances.' [Citation.]

"Where, as here, a lead agency has made a CEQA determination (negative declaration or EIR) and a responsible agency is making a subsequent separate discretionary decision, the responsible agency must follow whatever public notice and hearing procedure is appropriate for its subsequent separate discretionary decision. (Pub. Res. Code, § 21080[, subdivision] (a).) [County Waste] provided notice and held three public hearings before making its decision. [County Waste] made express factual findings that provided 'a brief explanation of the decision not to prepare' subsequent CEQA review. (Guidelines, § 15164[, subdivision] (e).) [County Waste's] staff report and the agency's three public hearings were a more thorough process than the staff report and one hearing found to be adequate in *Committee for Re-Evaluation of the T-Line Loop*, *supra*, 6 Cal.App.5th at p. 1256.

"Substantively, when a single public agency is reviewing a project that it approved previously, the public agency presumably must conduct sufficient investigation and analysis to make an informed decision 'whether the modification requires major revisions to the negative declaration.' (*Friends of the College I*, *supra*, 1 Cal.5th at p. 958, fn. 6 ['the inquiry prescribed by the Guidelines is . . . whether the modification requires major revisions to the negative declaration . . . .'].)

"Where, as here, a lead agency has made a CEQA determination (negative declaration or EIR) and a responsible agency is making a

21

subsequent separate discretionary decision, the responsible agency must also conduct sufficient investigation to make an informed decision 'whether the modification requires major revisions to the negative declaration.' The responsible agency can rely on the CEQA document of the lead agency, but must then exercise its independent judgment. [Citation.] There is substantial evidence in this case that [County Waste] conducted sufficient investigation to make an informed decision. [County Waste] staff made various inquiries to [Waste Management] and prepared a staff report. [County Waste] staff stated in an email: 'It seems that there are some differences between the project currently proposed and that approved in the 1998 permit and analyzed in the 2010 Negative Declaration. While we do not believe these will result in any additional environmental impacts, we do need to understand the differences.' [Waste Management] provided a letter in response. The [County Waste] Board or a committee of the Board held public meetings on February 9, 2017, February 22, 2017, and March 22, 2017.

"C. *Sundstrom* Analysis

"In *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, the court stated: 'CEQA places the burden of environmental investigation on government rather than the public. If the local agency has failed to study an area of possible environmental impact, a fair argument may be based on the limited facts in the record.' (*Id.* at p. 311.) The *Sundstrom* court then stated that any failure to investigate does not support a separate cause of action but rather '[e]nlarge[s] the scope of fair argument by lending a logical plausibility to a wider range of inference.' (*Ibid.*)

"[County Waste] argues that the *Sundstrom* analysis is inapplicable to a section 21166 decision and applies only where the court is evaluating a public agency's approval of an EIR. This court disagrees. The *Sundstrom*

22

analysis that a public agency cannot rely on its own lack of investigation and resulting sparse record applies equally to judicial review of EIRs, negative declarations, and section 21166 decisions.

"The *Sundstrom* analysis is, however, contextual. In an EIR, a public agency is required to undertake a thorough review. (Guidelines, §§ 15120–15151.) Under *Sundstrom*, the absence of investigation and analysis in an EIR enlarges the scope of fair argument. In a negative declaration, a public agency may base a decision on Guidelines section 15060 preliminary review, a Guidelines section 15063 initial study, and public comments. (Guidelines, §§ 15070 and 15074[, subdivision] (b).) A negative declaration does not require thorough investigation and analysis, and therefore may be based on a cursory initial study if the public agency obtains additional information that cures any defects in the initial study. [Citations.] A section 21166 determination is made in the context that there has been a prior EIR or negative declaration that is entitled to a degree of finality. [Citations.] Given that a section 21166 determination requires even less investigation and analysis than a negative declaration, the *Sundstrom* analysis has even less effect.

"D. Application to Facts of this Case

"The court finds no substantial evidence in the record 'to support a fair argument that the modification requires major revisions to the negative declaration.' (*Friends of the College of San Mateo Gardens v. San Mateo County Community College Dist., I* (2016) 1 Cal.5th 937, 958, fn. 6.)

"The Order of 3/20/18 states:

" '[Waste Management] and [County Waste]'s presentation of information could have been clearer. The information in the 2011 [negative declaration] and the 2017 Conformance Decision did not consistently identify

23

the total capacity of the facility, the total amount delivered to the facility, the amount sorted at the facility, the amount of non-compost waste processed at the facility, the capacity for onsite composting, the amount of composting input, and the amount of composting output.  In addition, the 2011 [negative declaration] used tons per day as the unit of measurement and the 2017 Conformance Decision used tons per year.  This complicated the analysis of whether there was a significant change in the project.'

"As a result, the court had to estimate how many days per year the various facilities would operate and convert the tons per day in the San Leandro 2011 [negative declaration] to the tons per year in the proposed 2017 Conformance Decision.  The written public disclosure was not a model of clarity.

"The public hearings, however, provided greater clarity.  At the Local Task Force meeting on February 9, 2917, Wendy Somer [County Waste] Board member, explained that the limited issue for the Board was whether there were changes that required additional CEQA review.

"On February 22, 2017, at the [County Waste] Board meeting on the first reading of the ordinance, Debra Kaufman explained that the CEQA inquiry was whether 'the ColWMP amendment is within the scope of activities addressed by the City of San Leandro's initial study neg. dec.' Shawn Tackitt, [Waste Management] project manager, stated:  'CEQA was completed by San Leandro [consultant] CH2M Hill.  There is no volume change at the facility and there's no new volume.'  Tackitt explained that all the emissions would be filtered.  Petitioner Stein raised concerns with air quality and that the compost volume would increase.  Tackitt explained that due to the composting process there would be a reduction in the outbound trucks.

"The [County Waste] Board addressed Petitioner Stein's concern about the difference between the 2011 plan and the 2017 plan as follows:

" 'DIANNE MARTINEZ:  For Mr. Tackitt or for staff, would someone be able to address Ms. Stein's comments about the discrepancies between the 2010 initial study and neg. dec. with the description of the current proposed project?'

" 'SHAWN TACKITT:  The current description of the project is exactly what is written in the negative dec. and the master plan for San Leandro. We have a component that's anaerobic digestion.  We have a component that is composting.  And we have a component that is the OMRF that separates the materials.'

" 'We are choosing to build the compositing facility first to get that up and running and meet some of our diversion goals that we have and then build anaerobic digestion secondarily.  That anaerobic digestion will take a fraction of the material that will be going into the compositing.  It will go into anaerobic digestion.  So we don't need it to happen first and we prefer to be able to get up and running and make the compost and see the material and then deploy the right technology and anaerobic digestion.'

" 'So from my perspective and I think everyone else who has reviewed the CEQA documents, including legal counsel, the description matches the master plan and the CEQA documentation exactly, not only from a description perspective but from a capacity perspective and permitting capacity, it is exactly.  I think there's some confusion about that, but we are operating this facility under the permitted capacity.'

"Tackitt explained why there were changes in the weight of input and output as follows:

25

" 'The inbound volume in traffic does not change.  The outbound volume—semi transfer trailers—those change, because if you can think about a dehydration—like, if you have a dehydrator, you dehydrate food.  You start out with something that's relatively heavy and full and by the time you're done dehydrating, it's a very wafer-thin piece of banana, right?  So this is the same thing.  As the food goes into the composting, it is dehydrated down.  All the moisture is taken out of it and that is where you get the reduction in weight.'

"On March 22, 2017, at the [County Waste] Board meeting on the second reading of the ordinance, Debra Johnson again explained the CEQA process, including that San Leandro was the lead agency and that [County Waste] was a responsible agency.  The [County Waste] Board considered the Greenfire letter[6] filed two hours before the meeting.

"Addressing concerns about changes from 2011 to 2017, Anjana Mepani, City of San Leandro senior planner, stated:

" 'The Davis Street transfer station's organics facilities were approved by the City of San Leandro in 2011 through a site-plan review process for the Davis Street transfer station master plan improvement.  That's what the project is called.  We did a thorough CEQA analysis and findings, which included outreach to the neighborhoods, property owners, businesses, as well as the agencies.  So that was completed as part of the process.'

" 'There's also some confusion about the terminology.  What you have before you as part of the Countywide Integrated Waste Management Plan.  And the terminology we used in the site-review plan and the CEQA approvals were referring to the same buildings, but they're just called different terms.

---

[6] This was an eight-page letter prepared by an attorney on behalf of Stein and Boone.

They are one and the same.  Where the organics materials recovery facility is the same as the food waste organics recycling facility in the CEQA document.  So I just wanted to clarify that.'

"Petitioner Stein raised concerns about changes from 2011 to 2017 as follows:

" 'And the importance of CEQA, the California Environmental Quality Act, is that it needs to be clear to the public.  It can't be—you know, the staff or highly trained people understand it in a different way than just citizens.  And the fact of the matter is that this project describes the amount of waste—food waste—that will be processed in the organics area is not going to be within the scope of the 2010 documents that clearly, clearly pronounce that it should be between 240 and 350 tons per day.  In fact, the staff report from StopWaste.org on this so-called state-of-the-art facility says 1,000 tons per day, which is nearly three times as much.  And with a project that expands to three times over a two-decade period has impacts that have not been fully reviewed by the public or for the environmental mitigations that are needed for this.'

"Petitioner Boone raised concerns about adequate disclosures as follows:

" 'When I tried to figure out, reading all the papers in front of me, what do they want to do now that's different from what they wanted to do in 2011, I was very confused.  It wasn't very clear.  The project description, as it's called, was kind of a little of a mess and the language was such that, if you really wanted to know what it's going to look like on paper, you couldn't tell. . . .  It's very possible to go back and rewrite the beginning of this document and get the 2010 stuff that was approved correlated with the [unintelligible].'

"Addressing comments in the letter and at the meeting, Tackitt stated:

" 'I just received this letter today when I arrived, so I haven't had a chance to thoroughly review it. But I can tell you that, as I skimmed through it, there is nothing that's been presented in the StopWaste report, the negative dec., or our master plan that is not consistent. We are today permitted to receive 5,600 tons. We are receiving much less than that in actuality. There will be no increase in truck traffic. In actuality, there will be a decrease in truck traffic of eight to ten trucks a day. The volume that's described in here there's not a very good understanding . . . . '

" 'These tons, when you look at the negative dec. analysis, they were up to a thousand tons per day for the composting part of this facility. A thousand tons—up to a thousand tons a day. What's being described here is subsets of that thousand tons. That's where the confusion is occurring.'

" 'The other part of the project, which is the material organics recovery facility, is up to 1,300 tons a day. Some of those tons they go into the organics composting. So, again, they are subsets of the tons. That's where the confusion is. These figures were analyzed in the negative dec. It's very clear. Each step of the process that's in the master plan and which was analyzed in the negative dec. is described in this StopWaste report. It is still our current objective to implement those processes. They are being done in phases, which I think is also the cause of some confusion. This is one building. As the phases are built, the wall is taken down and another building is attached to it to become a continuous building.' "

"There is no substantial evidence in the record 'to support a fair argument that the modification requires major revisions to the negative declaration.' [Citation.] First, information provided at the hearings indicates that there were no changes. Petitioner points to the confusing written

materials and asserts that there were changes. In the Order of 3/20/18, the court likewise concluded that the confusing written materials created a fair argument that there were changes. However, the court must look at the record as a whole, which includes the explanations at the hearings.

"Second, and more importantly, the question is not whether there were changes but whether there were changes that required major revisions to the negative declaration. Assuming that there were changes, Petitioners do not identify evidence in the record that supports a fair argument that the changes might cause 'new, and previously unstudied, potentially significant environmental effects.' (*Friends of the College I*, *supra*, 1 Cal.5th at p. 959; see also Guidelines, § 15162[, subdivision] (a).)

"Petitioners postulate that if there were an increase in the volume of material composted above the level permitted in the San Leandro [negative declaration], then there will be a corresponding decrease in air quality and increase in the volume of percolate liquid and methane, and that these decreases and increases will have 'new, and previously unstudied, potentially significant environmental effects.' Petitioners do not, however, identify substantial evidence that suggests the 'potentially significant environmental effects.' Not all evidence is substantial, and speculation is not substantial evidence.

"The court reaffirms the following statements in the Order of 3/20/18:

"1. Applying the fair argument standard, and assuming that the volume of the composting and digesting onsite increases from 350 tpd to 1,000 tpd, there is no substantial evidence that the increase in volume would have a significant environmental impact.

"2. There is no fair argument that an increase in the volume of water conveyed to the sanitary sewer might have a significant environmental effect.

29

"3.  The composting and digesting onsite will take place in enclosed facilities with filters, and therefore any effect on air quality is speculative.

"4.  Applying the fair argument standard, there is no substantial evidence that the change in the sorting process may have any environmental impact.

"5.  Petitioners have not identified any substantial evidence that hand separation does a better job than the proposed mechanical hydro-pulping process at separating organic from inorganic materials.

"6.  Applying the fair argument standard, there is no substantial evidence that the change in the composting and digestion process may have any environmental impact.

"7.  Expressions of concern and requests to conduct further environmental review regarding air quality effects are not substantial evidence of environmental impact.

"8.  Applying the fair argument standard, there is no substantial evidence that any change in the production, collection, storage, or use of methane may have any environmental impact.

"9.  Applying the fair argument standard, there is no substantial evidence that any change in the recycling of percolate liquid may have any environmental impact."

## DISCUSSION

Before we address the merits, there are several preliminary points to be made.

The first notice of appeal was filed by Boone, who has elected to represent himself in this court.  That is his right.  But a person "who exercises the privilege of trying his own case must expect and receive the same treatment as if represented by an attorney—no different, no better, no

30

worse." (*Taylor v. Bell* (1971) 21 Cal.App.3d 1002, 1009.) Moreover, "as is the case with attorneys, pro per litigants must follow correct rules of procedure." (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247.)

Rule 8.204 of the California Rules of Court specifies that "Each brief *must*: State each point under a separate heading or subheading, summarizing the point, and support each point by argument and, if possible, by citation of authority," and "support any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Italics added.) It also directs that "An appellant's opening brief *must*: Provide a summary of the significant facts limited to matters in the record." (Italics added.)

Boone's opening brief does not comply with these requirements. There is nothing like a summary of "significant facts." Several of the unnumbered pages of the brief purport to narrate historical events without a single reference to either the administrative record or the record on appeal. The sole case cited appears in what appears to be the conclusion, where, under "REQUESTED RELIEF," Boone "asks that the Superior Court order of June 2018 be vacated, that the ongoing construction and operational activities on the project be suspended, that [County Waste] be held to CEQA standards as the responsible agency, and that matters of significant change and consideration of alternatives be determined accurately and completely following the holdings in Friends of the College of San Mateo Gardens v. San Mateo County Community College District, 11 Cal.App.5th 596 (2017)."

Next, both Stein and Boone (supported by amici Zero Waste USA, Urban Ore, Conservatree, and Green America) direct argument at the wisdom, desirability, efficiency, or effectiveness of the processes that Waste

Management intends to install and operate at the Davis Street facility.[7]  This is not a proper focus of CEQA, particularly once a project has already been the subject of environmental review.

These parties may not like the trial court's analysis, but they cannot dispute the correctness of its essential outline.  There is no doubt that the 2011 negative declaration adopted by the City of San Leandro qualified as the initial environmental review required by CEQA.  A negative declaration is only permitted when "there is no substantial evidence that the *project or any of its aspects* may cause a significant effect on the environment." (Guidelines, § 15063, subd.(b)(2), italics added.)  Because it was not judicially challenged, the negative declaration is "final and conclusive on all persons" (§ 21080.1, subd. (a)), as Stein acknowledges.  There is no room for dispute that our Supreme Court did, as extensively shown from the trial court's orders, expressly authorize a public agency to make "a determination— whether implicit or explicit—that the original environmental document retains some informational value" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist. I*, *supra*, 1 Cal.5th at p. 951 (*Friends of the College I*)), that such a determination "is a predominately factual" determination, and that courts must respect that determination if it is supported by substantial evidence.  (*Id*. at p. 953.)

Nor can the dissatisfied parties contest the emphatic and unambiguous language from our Supreme Court that CEQA's subsequent review process is confined to "environmental consequences associated with the project."

---

[7]  Boone admitted to the Board that "aerobic composting . . . that's been around for 15 years.  I think most of the bugs are out of that system pretty well."  Accordingly, it should be understood that at issue is not the basic concept of anaerobic digestion composting, but only a variation or application of the general idea.

(*Friends of the College I*, *supra*, 1 Cal.5th at p. 951.)  CEQA defines "environment" to mean "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.)  It defines "significant effect on the environment" to mean "a substantial or potentially substantial, adverse change in  the environment." (§ 21068; Guidelines, § 15382.)  And "project" is defined as activity likely to cause either direct or reasonably foreseeable indirect "physical change in the environment."  (§ 21065.)

CEQA does not guarantee the Garden of Eden.  "CEQA is more or less a procedural scheme that makes no guarantees that environmental considerations will prevail."  (*Save San Francisco Bay Assn. v. San Francisco Bay Conservation etc. Com*. (1992) 10 Cal.App.4th 908, 923.)  "CEQA does not purport to approve or disapprove environmentally related activities. . . . [T]he courts . . . do not decide whether something is good or bad for the environment." (*South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1612.)

Economic changes or social effects are not to be considered unless they manifest as significant consequences to the physical environment.  (E.g., *Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 839, 847 ["CEQA is concerned with physical changes in the environment"]; *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1516 ["CEQA's mitigation requirements speak to . . . changes in the environment, i.e., changes in *physical conditions* within an area"]; *Cathay Mortuary v. San Francisco Planning Com*. (1989) 207 Cal.App.3d 275, 279 ["CEQA will come into play

33

only [with] a disruption of the physical environment"]; Guidelines, § 15131, subd. (a) ["The focus of the analysis shall be on the physical changes"].)

As Division Four of this District summarized: "An examination of the CEQA definitions . . . yields a common theme—in general, they deal with tangible physical manifestations that are perceptible by the senses. 'Environment' is a very broad concept encompassing both tangible and intangible factors. But the intangible has CEQA consequence only if there is a nexus to a physically perceivable reality. The major statutory emphasis is on matters that can be seen, felt, heard, or smelled, i.e., consequences resulting from physical impacts on the environment." (*Martin v. City and County of San Francisco* (2005) 135 Cal.App.4th 392, 403.) That court also noted that "CEQA is not to be stretched beyond 'the reasonable scope of the statutory language,' " and "is to receive a practical, common sense construction." (*Id.* at p. 402.)

Accordingly, it is not a judicial concern whether Waste Management has selected—or whether County Waste has approved—processes that may not be the most technologically sophisticated, the most economically sensible, or the most optimally efficient.

**Standard of Review**

"In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.)

34

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case . . . is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard Area*).) And " '[i]n applying the substantial evidence standard "the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision." ' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1135.)

"[W]hile we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' " *Vineyard Area*, *supra*, 40 Cal.4th at p. 435.) "We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 393.)

And, we reiterate, by " 'better argument,' " we mean we cannot concern ourselves with policy issues that are entrusted to local agencies and are outside CEQA's judicial scope. (See *Save San Francisco Bay Assn. v. San Francisco Bay Conservation etc. Com.*, *supra*,10 Cal.App.4th at p. 923 ["CEQA is more or less a procedural scheme that makes no guarantees that

environmental considerations will prevail"].)  Unless tangible environmental consequences are involved, courts do not adjudicate between policy arguments, for those are entrusted to the public agency.  (See *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 1001–1002 and decisions cited; *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 704 [" 'We do not judge the wisdom of the agency's action' "].)

## Responsible Agency

There are suggestions and asides in Boone's brief that County Waste was "not clear" that it was the responsible agency and, thus, "there is no responsible agency in this case."  Boone appears to believe that the City of San Leandro—which all agree was the lead agency when it adopted the negative declaration and permitted the facility in 2011—retains that status, and therefore "the project should be sent back to the City of San Leandro for concurrence before [County Waste] should consider this highly revised proposal."  The point is easily refuted.

First, Boone does not assert that he made this argument at the administrative level.  This is what the trial court meant by failing to exhaust administrative remedies, which is a jurisdictional bar to presenting the issue for the first time to the courts.  (See § 21177, subd. (a) ["An action . . . shall not be brought . . . unless the alleged grounds for noncompliance with this division were presented to the public agency"]; *City of Long Beach v. City of Los Angeles* (2018) 19 Cal.App.5th 465, 474–475 [" ' " '[t]he "exact issue" must have been presented to the administrative agency' " ' "].)

Second, even if the point had been preserved for review, it would fail on the merits.  CEQA makes a distinction between a lead agency and a responsible agency.  The City of San Leandro was the lead agency because it

36

approved the facility's permit and issued the negative declaration in 2011. (See § 21067 [" 'Lead agency' means the public agency which has the principal responsibility for . . . approving a project"]; Guidelines, § 15050, subd. (a) [lead agency is the agency "responsible for preparing [a] . . . negative declaration for the project"].)  By contrast, a "responsible agency" is "a public agency, *other than the lead agency*, which has responsibility for carrying out or approving a project."  (§ 21069, italics added;  Guidelines § 15381 ["For the purposes of CEQA, the term 'responsible agency' includes all public agencies other than the lead agency which have discretionary approval power over the project"].)  By considering, and approving, Waste Management's proposal, County Waste was clearly acting as the responsible agency.

Finally, in "the Greenfire letter" (see fn. 6, *ante*), Boone himself addressed County Waste as the responsible agency.[8]

### Addendum To The Negative Declaration

Guidelines section 15162, subdivision (a) provides that:  "When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared" unless there exist either "[s]ubstantial changes . . . which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects," or  "[n]ew information of substantial importance, which was not known and could not and could not have been known with the exercise of reasonable diligence at the time" showing "one or more significant effects" not previously addressed or significant effects "previously examined will be substantially more severe."

<hr />

[8]  For her part, Stein states flatly:  "Respondent Alameda County Waste Management Authority was indisputably the responsible agency under CEQA."

37

Guidelines section 15164 provides that the responsible agency "shall prepare an addendum" to a previously certified EIR or adopted negative declaration "if . . . changes or additions are necessary or none of the conditions described in Section 15162 . . . have occurred." It also provides "An addendum to an adopted negative declaration may be prepared if only minor technical changes or additions are necessary, or none of the conditions described in Section 15162 calling for the preparation of a subsequent . . . negative declaration  have occurred."

Citing *Friends of the College of San Mateo Gardens v. San Mateo County Community College Dist*. (2017) 11 Cal.App.5th 596 (*Friends of the College II*), Stein contends reversal is required because County Waste did not adopt an addendum to the 2011 negative declaration.

First of all, the follow up *Friends of the College II* decision is instantly distinguishable because there the public agency *did* adopt an addendum, the precise converse of what Stein asserts occurred here.

More importantly, CEQA specifies that no "action or proceeding shall . . . be brought . . . unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing during the public comment period . . . or before the close of the public hearing on the project." (Guidelines § 21177, subd. (a).)  This has been treated as a requirement that a person exhaust his or her administrative remedies, and satisfying this requirement is a jurisdictional prerequisite to seeking judicial relief.  (E.g., *Hines v. California Coastal Com*. (2010) 186 Cal.App.4th 830, 853; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 615–616.)  In other words, issues not addressed at the administrative level cannot be raised for the first time in court, and the CEQA plaintiff has the burden of showing that administrative remedies were

in fact exhausted.  (*Bridges v. Mt. San Jacinto Community College Dist*.
(2017) 14 Cal.App.5th 104, 115–116.)

Stein's brief does not mention that the addendum issue was raised by
her, or by someone else, when County Waste adopted the resolution under
challenge.  Thanks to modern technology, we were able to digitally search the
hundreds of pages of comments in the administrative record for the word
"addendum."  It was never once used.  We read the transcripts of the public
hearings, and neither Stein, nor Boone, nor anyone else, ever uttered the
word.  Nor does it appear in the Greenfire letter Stein and Boone sent to
County Waste's Board (see fn. 6, *ante*), although, to be fair, Guidelines section
15162 is twice cited.  Still, the clear import of the letter was to urge the Board
not to adopt the Ordinance, not that an additional document was required.

" 'The purpose of the rule of exhaustion of administrative remedies is to
provide an administrative agency with the opportunity to decide matters in
its area of expertise prior to judicial review.  [Citation.]  The decision making
body " 'is entitled to learn the contentions of interested parties before
litigation is instituted.' " ' " (*California Native Plant Society v. City of Rancho
Cordova*, *supra*, 172 Cal.App.4th at p. 616.)  Because Stein failed to bring the
absence of an addendum to the Board's attention, she was precluded from
raising it in court.  (*Bridges v. Mt. San Jacinto Community College Dist*.,
*supra*, 14 Cal.App.5th at pp. 115–116; *Hines v. California Coastal Com*.,
*supra*, 186 Cal.App.4th at p. 853.)

In point of fact, the issue is doubly barred.  It is an elemental principle
of appellate review that issues will not be considered on appeal unless they
were first raised at trial.  (E.g., *Burden v. Snowden* (1992) 2 Cal.4th 556, 570;
13 Witkin, Cal. Procedure (5th ed. 2020) Appeal, § 400, p. 458.)  But the point
Stein now presses was not mentioned in her amended petition, in her

statutorily-required statement of issues she intended to raise (see Guidelines § 21167.8, subd. (f)), in her briefs filed in the trial court, or in the papers supporting her motion to vacate the judgment or for new trial. The absence of the issue from the trial court's lengthy orders is conspicuous.

Finally, there is no reason the Ordinance itself cannot serve as the addendum to the negative declaration.[9]

## Consideration Of Alternatives

The Legislature has declared it to be the policy of the state to "Require governmental agencies at all levels to consider . . . alternatives to proposed actions affecting the environment." (§ 21001, subd. (g).) Boone contends County Waste did not do so. However, the obligation to consider alternatives applies to the original environmental review document, which in this case was the 2011 negative declaration. (§ 21002 ["public agencies should not approve projects . . . if there are feasible alternatives"]; see §§ 21002.1,

---

[9] Guidelines section 15164 does not specify the content of an addendum beyond that it should include a "brief explanation of the decision" that may be "included as an addendum" to the previous environmental document, "or elsewhere in the record." The Ordinance has recitals that County Waste "is a Responsible Agency under CEQA, that this project underwent the required review under CEQA, and that [County Waste's] action is within the scope of activities addressed by the City of San Leandro's negative declaration and initial study ('ND/IS')." It also, under the heading "CEQA Determinations," stated that the Board's "approval of the ColWMP amendment and conformance determination, as conditioned, will have a less than significant impact on the environment as documented in the ND/IS." Most significantly, another of the Board's findings was that "since the City of San Leandro's adoption of the ND/IS, no substantial changes have occurred and no new information or changed circumstances exist that require revisions of the ND/IS due to new significant environmental effects or a substantial increase in the severity of previously identified significant effects." This last quoted language is obviously taken from Guidelines section 15162 as quoted at the beginning of this analysis.

subds. (a), 21061, 21100; Guidelines, §§ 15252, subds. (a)(2)(A) & (B); *Laurel Heights*, *supra,* 47 Cal.3d at p. 400 ["project alternatives must be discussed in an EIR"].)  In addition, this court long ago noted that "the requirement as to the discussion of alternatives is subject to a construction of reasonableness. The statute does not demand what is not realistically possible, given the limitation of time, energy, and funds.  [A] 'crystal ball' is not required." (*Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 910)

Waste Management proposed to continue operating an existent recycling facility, but modifying the recycling process inside that facility.  It is clear from their briefs that Boone and amici read "alternatives" as an opportunity to revisit the relative merits of the new recycling process approved by County Waste.  Here our caution against straying beyond CEQA is decidedly applicable.

### Fair Argument

The primarily contention made by Stein—and to a lesser extent by Boone—is that the recycling process proposed by Waste Management was sufficiently different, both qualitatively and quantitively, from the existing process, that County Waste was obligated to prepare a new environmental document, and no longer rely on the negative declaration adopted back in 2011.  As shown by the trial court's detailed analysis, the contention has several analytical steps.

As with her addendum argument, Stein bases her contention on Guidelines section 15162, subdivision (a).  As relevant here, it reads:

"When . . . a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on

41

the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1)  Substantial changes are proposed in the project which will require major revisions of the . . . negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2)  Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the . . . negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3)  New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time . . . the negative declaration was adopted, shows any of the following:

"(A)  The project will have one or more significant effects not discussed in the . . . negative declaration;

"(B)  Significant effects previously examined will be substantially more severe than shown in the [negative declaration]."

As already discussed, our Supreme Court's decision in *Friends of the College I* requires that we first test County Waste's implicit determination that the negative declaration retained informational value.  Stein does not challenge that determination, which, upon de novo review, we conclude is sound and supported by substantial evidence.  (*Friends of the College I*, *supra*, 1 Cal.5th at p. 953.)

The second stage would be whether, or what extent, *Sundstrom v. County of Mendocino*, *supra*, 202 Cal.App.3d 296 (*Sundstrom*) is pertinent.

*Sundstrom* exerts a natural allure, dealing as it did with a private sewage treatment facility, approved with a negative declaration by the local agency. The major point in *Sundstrom*, and for which it is most cited, is that a local agency cannot defer to a future date, or delegate to the applicant, its duty to assess whether the proposed project might entail environmental impacts. (*Id*. at p. 307; see, e.g., *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 141; *California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 194; *California Native Plant Society v. City of Rancho Cordova*, *supra*, 172 Cal.App.4th at p. 621.)  As one court put it:  "In *Sundstrom*, the lead agency under CEQA, in  proceeding under a negative declaration, 'had determined, before the required studies were even performed, that the project would not have a significant impact on the environment.' " (*San Joaquin River Exchange Contractors Water Authority v. State Water Resources Control Bd.* (2010) 183 Cal.App.4th 1110, 1132.)  This is not the point of Stein's reliance upon *Sundstrom*.

Stein focuses upon this language in *Sundstrom*:  "While a fair argument of environmental impact must be based on substantial evidence, mechanical application of this rule would defeat the purpose of CEQA where the local agency has failed to undertake an adequate initial study.  The agency should not be allowed to hide behind its own failure to gather relevant data. . . .  CEQA places the burden of environmental investigation on government rather than the public.  If the local agency has failed to study an area of possible environmental impact, a fair argument may be based on the limited facts in the record.  Deficiencies in the record may actually enlarge the scope of fair argument by lending a logical plausibility to a wider range of inferences." (*Sundstrom*, *supra*, 202 Cal.App.3d at p. 311.)  Stein also invokes

43

the "less deferential" language in the follow-up *Friends of the College II* decision (2017) 11 Cal.App.5th 596, 607).

Yet there is a crucial reason why these two decisions are inapposite. Missing in *Sundstrom*, and in the follow-up *Friends of the College II* decision, was what is present here—an initial study that no one challenges as environmentally inadequate.[10]  Moreover, the bottom line of those decisions would merely set up the next, and last, analytical step—whether there is fair argument that the Waste Management project will have adverse environmental impacts.

We note that our Supreme Court has held:  "A negative declaration is permitted when 'there is no substantial evidence that the project or any of its aspects *may* cause a significant effect on the environment.' . . . [W]hen a project is initially approved by negative declaration, a 'major revision' to the initial negative declaration will necessarily be required if the proposed modification *may* produce a significant environmental effect that had not previously been studied.  [Citation.]  Indeed, if the project modification *introduces previously unstudied and potentially environmental effects* that cannot be avoided or mitigated through further revisions to the project plans,

---

[10]  The *Sundstrom* court also noted that "Even if the initial study is defective, the record may be extensive enough to sustain the agency's action." (*Sundstrom*, *supra*, 202 Cal.App.3d at p. 305.)  The court also found no CEQA objection to requiring the project proponent to satisfy the environmental demands of other agencies.  (*Id*. at p. 308 [such conditions "are beyond criticism"].)  Both of these options are present here because the administrative record reaches:  (1) the County Waste amendment of the ColWMP to add the project at the DSTS to the ColWMP's list of System Components; (2) County Waste conditioning its approval on the facility being constructed and operated in compliance with the assumptions in the 2011 negative declaration; (3) the Alameda County Department of Environmental Health granting a permit for the OMRF; and (4) the BAAQMD approving construction and operation of the OMRF.

then the appropriate environmental document would no longer be a negative declaration at all, but an EIR." (*Friends of the College I, supra,* 1 Cal.5th at p. 958, third italics added.)

And we reiterate that CEQA requires an EIR "only for those aspects of a project likely to have *significant* environmental effects. Section 21151, subdivision (b), governing local agency preparation of EIRs, specifies that 'any significant effect on the environment *shall be limited to substantial, or potentially substantial, adverse changes* in physical conditions which exist within the area as defined in Section 21160.5.' (Italics added.) Section 21060.5 refers to 'the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise [and] objects of historic or aesthetic significance.' " (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 172.)

We recognize that a public agency has a certain amount of discretion in deciding "whether to classify an impact . . . as 'significant,' depending on the nature of the area affected. [Citations.] In exercising its discretion, a [public] agency must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting." (*North Coast Rivers Alliance v. Marin Municipal Water District Board of Directors* (2013) 216 Cal.App.4th 614, 624–625.) Also, the standard for the agency "is not whether *any* argument can be made that a project might have a significant environmental impact, but rather whether such an argument can *fairly* be made." (*Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1003.)

Our review may be de novo, but that does mean the trial court's extensive reasoning is of no use to us. Quite the contrary, we have quoted

45

from the trial court's orders because they have considerable worth as an impartial framing of the issues. And they demonstrate how Boone and Stein have narrowed their focus on these appeals.

Another merit is the trial court's discussion of the evidence in the administrative record, which we would ordinarily expect to be addressed by Stein. (See *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1402 ["As with all substantial evidence issues, an appellant challenging the evidence must lay out the evidence favorable to the other side and show why it is lacking. A reviewing court need not independently review the record to make up for an appellant's failure to carry this burden"].) Both as a petitioner for writ relief, and as appellant here, Stein "bears the burden of proof to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact." (*Jensen v. City of Santa Rosa* (2018) 23 Cal.App.5th 877, 886.)

Stein makes a passing reference to the new process being "more hazardous," but the only impacts she identifies are "air quality and odor." Reflecting her own expertise, much of her analysis is technical. We are not obliged either to match her scientific knowledge or to acquire a complete understanding of the technology. (*Vineyard Area*, *supra*, 40 Cal.4th at p. 435; *Laurel Heights*, *supra*, 47 Cal.3d at p. 393.) And we are certainly unimpressed with her attacks on the trial court's intelligence.

On page 49 of her brief, Stein states she "asserted that tripling the amount of material composted onsite will increase the odors and the air pollutants into the neighborhood proportionately to the amount processed and that by tripling the amount, air pollutants will inevitably leave the enclosed building. See infra

46

p. 43-44 and AR 841." But pages 43 and 44 of her brief have nothing demonstrating that Stein "asserted" anything to anyone. And page 841 of the administrative record is a page from the *draft* "Initial Study and Mitigated Negative Declaration" prepared for the Alameda County Planning Department in 2011that makes no mention of Stein.[11] On page 45 we are told that "Dr. Stein testified that when the material is tripled from 350 tpd to

---

[11] The following is marked on the page: "In addition to air quality regulations, it is also assumed the project would comply with CCR Title 14, Division 7, Chapter 3.1, Article 3, Compostable Materials Handling Operations and Facilities Regulatory Requirements. Specifically, the project would comply with the requirements of Section 17863.4 to have an Odor Impact Minimization Plan. It is assumed that compliance with the plan, in addition to the design of the facilities (i.e., enclosed buildings), would result in controlling odor emissions." There is no way of knowing who did the marking.

The page cited is in a four-page-long section titled "Regulatory Setting," which outs the extensive federal, state, and local  Stein may have meant to cite page 843, where is the following:

"Construction and operation of the project would result in emissions of criteria pollutants and air toxics.  Construction of the project would create a short-term increase in emissions, however, the emissions would be less than the BAAQMD thresholds.  Therefore, construction would be consistent with the BAAQMD air quality plans.

"Operation of the project would be anticipated to generate criteria pollutant and air toxics emissions.  It is assumed that fugitive dust from onsite unpaved roads would be controlled following current permit conditions . . . .  Operation of the project would be consistent with the BAAQMD 2010 CAP."

Finally, on pages 844–845, is the following:  "As shown in Table 3-4, emissions would be less than the BAAQMD thresholds except for daily emissions of $PM_{10}$ and $PM_{2.5}$.  [¶]  The exhaust $PM_{10}$ and $PM_{2.5}$ emissions would be much lower than the BAAQMD thresholds."  Because these conditions could be mitigated, one of the four air quality criteria was determined to have "No Impact," while the other three were deemed to have a "Less Than Significant Impact."

47

1,000 tpd, air pollutants will leave the building even if 'enclosed.'  Her testimony on this point is corroborated by a County report discussing [Waste Management's] Altamont Landfill.  See AR 841 and p. 44–44 infra."

So, Stein is instancing what might have been the situation at a different facility in 2011.  The page in the administrative record she cites clearly implies that existing structures and requirements, particularly the BAAQMD (see Health & Saf. Code, §§ 40232–40233), are more than adequate to preserve air quality.  Stein does not document that she asserted, or testified, concerning the point she now raises.  This does not establish "the existence of substantial evidence supporting a fair argument of significant environmental impact." (*Jensen v. City of Santa Rosa, supra,* 23 Cal.App.5th at p. 886.)

Stein makes much of the fact that she is an expert, and thus her environmental opinions and conclusions have more than ordinary credibility.  The Guidelines do direct that expert opinion can constitute substantial evidence to support a fair argument, but only when it is "expert opinion supported by facts."  (Guidelines § 15384, subds. (a) & (b).)  But unsupported opinion by an expert is excluded, as this court has repeatedly noted.  (See *Hines v. California Coastal Com*., *supra*, 186 Cal.App.4th at p. 857 [" 'Opinions which state "nothing more than 'it is reasonable to assume' that something 'potentially . . . may occur' do not constitute substantial evidence . . . ." ' "]; *Association for Protection of Environmental Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 735–736 ["project opponents must produce some evidence, other than their unsubstantiated opinions"].)

The question of air quality merges with Stein's next point.  There appears to be no disagreement that up to Waste Management's proposal, in Stein's words, "all of the three processing steps involved in the approved

48

DSTS compost process were to take place indoors in one single building with no breaks to the outdoors." In other words, the entire compositing process took place inside an enclosed building.

However, again in Stein's words, "the approved 2011 Project was changed in 2017 so that the compost process was no longer entirely indoors and no longer delineated to be inside of one single building but was instead changed to be in 3 separate buildings and only the initial stage of anaerobic digestion was to occur before the product of this anaerobic digestion, the digestate, was shipped offsite. The change was from 'all indoors' to 'partly indoors'. The material to be processed in the 2017 Project was tripled from the amount permitted by the 2011 Project" Specifically, "in the 2017 approval all digestate material was allowed by the amended ColWMP to be shipped offsite without the onsite indoor anaerobic composting or curing steps that were required in 2011." Thus, "there is a different level of odors and air pollution generated and emitted to the outdoors when uncured and once-processed digestate is taken outside and loaded into trucks and shipped offsite."

It is true that Stein can point to several instances where, at various stages in the administrative and the legal proceedings, persons associated with both Waste Management and County Waste made comments that can be read as indicating perhaps a less than complete familiarity with whether the proposed project would have one or three buildings. The confusion may be the result of the somewhat unorthodox manner in which the new facility will be constructed, a point addressed by Mr. Tackitt and quoted in the trial court's second order. The point is of no real significance, and may trace to the fact that there having always been, and will continue to be, three processes. Ultimately, the point is without environmental significance because however

49

many buildings, all will be enclosed.  The only material point is whether there is substantial evidence in the administrative record that the proposed Waste Management facility might entail adverse environmental impacts.

In her opening brief, Stein repeatedly asserts or implies that the new recycling processes would be "open" and exposed to the air.  However, the materials in the administrative record clearly show that the processes, particularly the OMRF, are intended to be within an enclosed building.

Whether Stein's generic "odors and air pollution" includes methane is unclear.  She makes no argument that the trial court incorrectly reasoned that *no* methane would be released into the atmosphere.

The original project building was analyzed before San Leandro adopted the negative declaration in 2011.  In the part of the initial study captioned for "Odor Control/Management," was the following:  "Both the Food Waste/Organic/ Green Waste Compost and the Food Waste /Organic Recycling operations will occur in enclosed buildings.  To contain odors generated by the unloading and handling of organic material, the buildings will be designed to minimize the number of openings and large vehicle access doors will be equipped with high-speed doors.  To control odor, the buildings will be equipped with an air handling and ventilation system to capture exhaust from the building so that it can be treated for odor prior to release to the atmosphere.  The air will be treated using a bio-filter system and/or a mechanical air handling and treatment system, such as a misting system.  Bio-filters have been proven effective at removing odors from air that are caused by mixed organics and sulfur  compounds, which are the main source of odor associated with green waste and food waste handling and processing."  "The proposed Project is required to and will comply with the applicable . . . BAAQMD . . . regulations, including the guidelines for composting facilities

through the collection and control of biogas, and through the use of a bio-filter system." The project was assessed as having a "less than significant impact" on air quality, it being noted that "the proposed Project would not create objectionable odors affecting a substantial number of people."

Moreover, for the new facility, Waste Management added a new feature: an internal negative air pressure system to prevent the escape of contaminated air.

When the County Waste Board adopted the Ordinance under challenge, it attached a number of "Conditions of Approval," including:

"1. Operations at the DSTS Organics Facilities (facilities) shall comply with all requirements governing the design and operation of compost operations under the Compost Materials Handling Facility permit as set forth in Title 14 of the California Code of Regulations [§ 17850 et seq.].

"2. The materials that may be processed through the DSTS organics facilities are limited to the materials that the Davis Street Transfer Station is currently permitted to take.

"3. The facilities will not result in an increase of currently permitted tonnage of . . . incoming material per day.

"4. The facilities shall operate within the conditions contained within the CUP [conditional use permit] from the City of San Leandro.

"5. The Facilities shall be constructed and operated in compliance with the assumptions made in the Initial Study and Negative Declaration adopted by the City of San Leandro to the extent applicable to the facilities."

Stein insists that the increase made the new project fundamentally different from that approved in 2011. County Waste and Waste Management counter that the trial court erroneously concluded that new project entailed an increase in the amount of material processed, thereby ignoring the Board's

51

findings that Waste Management's proposal was "within the scope of activities addressed" by the 2011 negative declaration, and that "no substantial changes have occurred" and no changed circumstances exist that require revision of the negative declaration. This is not an issue that demands our resolution. By itself, an increase in amount or volume that the new facility will handle is not per se an environmental impact, as CEQA defines that term. Indeed, with more material being processed, and fewer trucks needed to transport the processed material off site, the new project would appear to promote the goals of increasing the amount of recycled material that Stein and Boone so vigorously advocate in their briefs.

"[A] condition requiring compliance with regulations is a common and reasonable . . . measure, and may be proper where it is reasonable to expect compliance." (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906, citing *Sundstrom*.) Here, County Waste's approval was conditioned on Waste Management complying with " 'a host of specific performance criteria imposed by various ordinances, codes, and standards . . . .' " (*Id*. at p. 910.) As County Waste and Waste Management point out in their joint brief, the new facility "must comply with California's strict, multifaceted regulations governing compost and digestate handling and quality."

Ever since the DSTS opened, Waste Management has operated under the numerous regulatory restrictions imposed by the original permit, many of which are intended to preserve air quality. There is no evidence in the record that Waste Management has ever failed to comply with those restrictions, or that air quality at the DSTS was compromised. In light of this history, it was reasonable for County Waste to believe that Waste Management would continue to obey the " 'host of specific performance criteria' " imposed by other

52

agencies and that those official requirements would be sufficient to preserve air quality in the future.

Stein's final point, which she argues at great length, is that there is a fair argument "that the project changes will cause environmental impacts by modifying legislative policies that require recycling to be maximized," citing provisions in the Waste Management Act, and Measure D, an initiative enacted by Alameda County voters in 1990 (which was examined and sustained in *City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264). Our response will be brief.

Initially, we note that here Stein's increased volume argument works against her, because the amount of recycled material will obviously be greater, thus promoting the goal of maximizing recycling. As for the state act, its administration is entrusted to County Waste, which, by approving it, presumably found it compatible with the state statutes and goals. (§ 41750; cf. Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"].) Moreover, the County Waste Board is composed of persons and elected representatives from throughout Alameda County, and it would be most unlikely that they would be oblivious to the state and local measures now invoked by Stein. Indeed, the Oakland supervisor of Oakland's solid waste and recycling program advised the Board that the proposed project was necessary to fulfilling Oakland's recycling goals. Finally, maximizing recycling policy is not a CEQA purpose.

In light of the foregoing, there is no need to discuss Stein's argument that the trial court erred in not augmenting the administrative records with these legislative measures.

In sum, after independently reviewing the administrative record, and due allowance for the Board's discretion and expertise (*Vineyard Area, supra,*

40 Cal.4th at pp. 427, 435; *Laurel Heights*, *supra*, 47 Cal.3d at p. 393; *North Coast Rivers Alliance v. Marin Municipal Water District Board of Directors*, *supra*, 216 Cal.App.4th at p. 624), we conclude Stein and Boone have not identified substantial evidence establishing that a fair argument significant environmental impacts that are either new or substantially more severe than was the case when the negative declaration was adopted in 2011. (Guidelines, § 15162(a); *Friends of "B" Street v. City of Hayward*, *supra*, 106 Cal.App.3d at p. 1003.)

## DISPOSITION

The judgment is affirmed.  County Waste and Waste Management, who filed a joint brief, shall recover their costs on these appeals.  (Cal. Rules of Court, rule 8.278.)

_____

Richman, Acting P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

*Stein et al. V. Alameda County Waste Management* (A154804)